Present:  Carrico, C.J., Lacy, Keenan, Koontz, and Kinser, JJ., and Compton and Stephenson, Senior Justices

VICTOR ALAN MOTLEY

                                        OPINION BY
v.  Record No. 000417      CHIEF JUSTICE HARRY L. CARRICO
                                   September 15, 2000
VIRGINIA STATE BAR

        FROM THE VIRGINIA STATE BAR DISCIPLINARY BOARD

     In this appeal of right, we review an order of the

Virginia State Bar Disciplinary Board (the Disciplinary

Board) involving Victor Alan Motley (Motley), a Richmond

attorney.  Dated November 5, 1999, the order imposed upon

Motley an eighteen-month license suspension for mishandling

a real estate transaction and mismanaging a trust account.

Finding no error in the order, we will affirm.

## 1. The Real Estate Transaction

### Background

     The real estate transaction in question involved an

oral contract for the sale and purchase of a house and lot

in the City of Richmond, entered into in February of 1996

between Evelyn J. Davis (Davis),[1] the seller, and Rebecca

Gray (Gray), the purchaser.  Motley's conduct with respect

to the real estate transaction implicates DR 6-101 of the

Virginia Code of Professional Responsibility, which was in

---

[1] Evelyn Davis is also referred to in the record as Evelyn Meade and Evelyn Steele.  Because the Disciplinary Board in

effect at all times pertinent to this case.[2]  DR 6-101 dealt with competence and promptness and a lawyer's duty to keep a client reasonably informed.[3]

Retained by a realtor to act as settlement attorney in the transaction, Motley concedes he represented "both the seller . . . and the buyer."  Before consulting with Motley, Davis and Gray had agreed that Davis would sell the property to Gray for $35,000.  Gray agreed to pay $4,000 in cash at closing and assume an existing deed of trust held by Suncoast Savings and Loan Association, FSA (Suncoast) for the balance.

Motley undertook the drafting of the necessary documents and the closing of the transaction.  Closing was scheduled for February 15, 1996.  Shortly before that date, Gray announced that she could pay only $2,000 at closing.  Davis agreed to accept the $2,000, provided that Gray execute a deed of trust and note in favor of Davis to secure payment of the remaining $2,000 by May 15, 1996.

its order referred to her as Davis, we will use the same name in this opinion.

[2] Effective January 1, 2000, the Virginia Code of Professional Responsibility was replaced by the Virginia Rules of Professional Conduct.

[3] The subjects of competence, promptness, and a duty to inform are now contained in Rules 1.1, 1.3(a), and 1.4(a),(b), and (c) of the new Rules of Professional Conduct, respectively.

On February 15, Motley, Davis, and Gray met to close the transaction. Gray had no funds with her but stated she would pay $1,000 the next day and make another payment of $1,000 in a few days. The parties signed the closing papers, but agreed that the deed would not be recorded until the first payment of $1,000 was made. Davis gave Gray the keys to the house and agreed she could move in.

On February 17, Gray gave Motley a non-certified check for $1,000 drawn on the account of a third party in an out-of-state bank. Motley told Davis the check was not certified, but she agreed that the deed could be recorded.

Motley deposited the $1,000 check in his personal account, and the bank returned the check for "[n]ot sufficient funds." Motley deposited in his trust account the proceeds of a personal loan in the amount of $3,026.27. He wrote trust account checks payable to his own order for a total of $2,300, leaving a balance of $726.27 of personal funds in the trust account. In addition, he wrote three trust account checks totaling $550 relative to the Davis-Gray transaction, including a check to Davis for $319.80, representing what Motley said was her part of the $1,000 check that was returned for insufficient funds. These checks were not paid from funds provided by Gray but from Motley's personal funds.

3

Gray took possession of the property in late February or early March of 1996. In May 1996, Motley informed Davis that he had received from Gray a certified check for $1,500. Motley also told Davis that she owed him an additional $200 because Gray had only made good to the extent of $800 on the $1,000 check that was returned for "[n]ot sufficient funds." After consulting another attorney, Davis agreed to accept the check, but she refused Motley's demand that she pay him the extra $200. Although Davis should have received a total of $3,373.23 in cash from the sale of her property, she received only $1,819.80.

Two documents Motley prepared and had Davis sign at the closing formed part of the basis for the Disciplinary Board's finding that Motley had violated DR 6-101. The two documents were a promissory note dated February 15, 1996, and made payable to Gray for $3,366.78 and a deed of trust purportedly securing payment of the note. According to Motley, these documents were ostensibly designed to give Gray "security" for a debt in the sum of $3,366.78 Davis owed to a finance company for windows she had installed in the house at some point in time prior to the closing.[4]

---

[4] The deed of trust that was to provide this "security" is not part of the record, but the evidence shows it did not describe any property that was to stand as security for payment of the promissory note Davis signed in favor of

4

Also forming part of the basis for the Disciplinary Board's finding of a violation of DR 6-101 was Motley's alleged failure to comply promptly with instructions of Suncoast to forward documentation necessary to complete Gray's assumption of the existing deed of trust on the property. As late as March 21, 1996, Motley had not sent Suncoast "Proof of Insurance coverage and paid receipt." Apparently, Motley never did send the information, but Gray did.

## 2. Trust Account Problems

### Background

Motley's questionable handling of his trust account in the Davis-Gray transaction led to a broader investigation into his management of the account. Motley's conduct with respect to the trust account implicates former DR 9-102, which dealt with preserving the identity of funds and property of a client, and DR 9-103, which prescribed record-keeping requirements.[5]

Lacy O. Campbell, a State Bar investigator, made an analysis of Motley's records for the period July 1, 1995,

---

Gray. Apparently, it was Motley's intent that property Davis obtained at some time in the future would later on be included in the deed of trust.

[5] The subjects of preserving identity and keeping records are now contained in Rule 1.15 of the new Rules of Professional Conduct.

through June 30, 1996.  The analysis revealed numerous deficiencies in Motley's record-keeping and accounting practices.  We will detail the results of the analysis infra.

On June 5, 1996, Davis filed with the Virginia State Bar a complaint against Motley for his handling of the real estate transaction.  On June 25, 1999, the Third District Subcommittee, Section Two, certified to the Disciplinary Board charges of misconduct against Motley relating both to his handling of the Davis-Gray real estate transaction and the management of his trust account.  On July 8, 1999, the State Bar served Motley with the Subcommittee's certification.  On September 24, 1999, the Disciplinary Board held a hearing in the matter, and by order dated November 5, 1999, suspended Motley's license to practice law for eighteen months.

### 3. Issues on Appeal

### A. Motions to Dismiss

### 1. Delayed Notice

Motley argues that the Disciplinary Board erred in denying his motion to dismiss the charges against him on the ground the charges were before the Disciplinary Board in violation of Part 6, Section IV, Paragraph 13

(B)(5)(c)(ii)(c) and Subsection (12) of the Rules of this Court. Subsection (12) contains the pertinent language:

> If the Subcommittee has elected to certify the Complaint . . . to the Board, it will promptly mail to the Clerk of the Disciplinary System a statement of the certified charges which shall include sufficient facts to reasonably notify Bar Counsel and the Respondent of the basis for such certification and the Disciplinary Rules alleged to have been violated.

Motley points out that the Third District Subcommittee determined on July 17, 1998, to certify charges of misconduct against him but did not send the certification to the Clerk of the Disciplinary System until June 25, 1999, some eleven months later, and he was not served until July 8, 1999. This delay, Motley says, "violated procedural requirements under the [Rules] and prejudiced [his] right to a fair and prompt hearing."

Motley does not explain, however, what prejudice he suffered as a result of the delay. In the absence of a showing of prejudice resulting to Motley from the failure to comply with the procedural requirement of prompt mailing contained in Subsection (12), dismissal of the charges against him would be inappropriate. See Jamborsky v. Baskins, 247 Va. 506, 511, 442 S.E.2d 636, 638-39 (1994) (delay of circuit court in complying with procedural requirement in juvenile transfer statute does not divest court of jurisdiction if no prejudice results); see also

7

*Horne v. Commonwealth*, 230 Va. 512, 518-19, 339 S.E.2d 186, 191 (1986) (delay in taking accused before magistrate not ground for excluding evidence without resulting prejudice); *Potter v. Commonwealth*, 10 Va. App. 113, 116, 390 S.E.2d 196, 198 (1990) (delay in filing habitual offender information not ground for dismissal in absence of showing of prejudice resulting from the delay).

## 2. General Investigation of Trust Account

Motley also moved for dismissal of the charges against him on the ground the enlargement of the investigation of misconduct from the original scope of the Davis-Gray real estate closing to a general investigation of his trust account "without due cause" violated his rights to due process and equal protection of the law under the Fourteenth Amendment. He was denied due process and equal protection, Motley says, "in that Bar Counsel exercised undue discretion by converting an investigation of a complaint relating to a single real estate closing into a general perusal of an attorney's trust account."

Part 6, Section IV, Paragraph 13(B)(3) of the Rules of this Court provides in pertinent part that the authority of Bar Counsel to investigate and prosecute complaints

> includes the authority to examine the financial books and records maintained by an attorney . . . including, without limitation, any and all trust accounts . . .

8

maintained by the attorney . . . . Bar Counsel may also examine an attorney's trust account whenever Bar Counsel reasonably believes that the trust account may not be in compliance with the . . . Code of Professional Responsibility.

Although Motley's argument is not clear, he does not appear to attack the facial validity of the Rule quoted above. In any event, the Rule is presumed to be valid, see Pulliam v. Coastal Emergency Servs., Inc., 257 Va. 1, 9, 509 S.E.2d 307, 311 (1999), and Motley has not demonstrated in what manner or to what extent it suffers from facial invalidity. Accordingly, we will consider only the as-applied aspect of Motley's attack upon the Rule, consisting of his argument that the investigation was transformed from its original limited scope into a general investigation of his trust account without due cause.

In Seventh Dist. Comm. v. Gunter, 212 Va. 278, 183 S.E.2d 713 (1971), we said:

A proceeding to discipline an attorney is not a criminal proceeding and the purpose is not to punish him but to protect the public. It is a special proceeding, civil and disciplinary in nature, and of a summary character. . . . Being an informal proceeding it is only necessary that the attorney be informed of the nature of the charge preferred against him and is given an opportunity to answer.

Id. at 284, 183 S.E.2d at 717.

We are of opinion that Motley has failed to demonstrate that he suffered a deprivation of due process

9

or equal protection rights as a result of the broadened investigation itself or from the admission into evidence of certain exhibits obtained in the investigation.[6] He was fully informed of the nature of the charges stemming from the broadened investigation, and he was given ample opportunity to answer. Furthermore, Bar Counsel had due cause from the investigation of Motley's trust account in connection with the Davis-Gray real estate transaction for a reasonable belief that the account may not have been in compliance with the Rules in other respects as well.

Bar Counsel would have learned from the investigation into the Davis-Gray real estate transaction that Motley deposited proceeds from a personal loan into his trust account and deposited a check from a client (Gray) into his personal account. Indeed, Motley conceded as much during the proceedings below.[7]

Former DR 9-102(A), styled "Preserving Identity of Funds and Property of a Client," provided that all funds received or held by a lawyer on behalf of a client residing

---

[6] Motley contends that the Disciplinary Board erred in admitting into evidence two exhibits over his objection that they were obtained in violation of his rights of due process and equal protection under the Fourteenth Amendment.

[7] Motley's counsel conceded these facts in a letter dated December 9, 1996, to Campbell, the investigator for the State Bar.

in this state shall be deposited in a trust account and no funds belonging to the lawyer shall be deposited therein except under circumstances not pertinent here.[8]  Given this Rule and the information disclosed by the investigation into the Davis-Gray real estate transaction, we find no abuse of discretion in Bar Counsel's broadening of the scope of the investigation into Motley's trust account.

## B. Continuance

Motley obtained a summons and had it served on Gray to appear as a witness at the hearing before the Disciplinary Board.  Gray failed to appear, and Motley moved for a continuance.  The Board denied the motion, stating that "the panel does not believe that Ms. Gray's testimony would be material."

Motley argues that Gray's testimony was material and that it was reversible error for the Disciplinary Board to refuse to continue the case when she failed to appear.  However, Motley's counsel conceded during argument on the motion for a continuance that he had "never spoken to Ms. Gray," and he even said "[s]he's adverse."  Therefore,

---

[8] The exceptions are that funds reasonably sufficient to pay service or other charges of the financial institution may be deposited in the trust account and that funds belonging in part to a client and part to the lawyer must be deposited in the account but the portion belonging to the lawyer must be withdrawn promptly after it is due.

11

Motley was hardly in a position to assert the materiality of Gray's testimony or to claim prejudice from her failure to appear.

Even so, with the Disciplinary Board's permission, Motley's counsel made a proffer of what Gray would say "if [she] was here to testify." Counsel said that Gray would corroborate Davis that "both agreed . . . that [with respect to the indebtedness Davis owed for the windows] they were going to have this note and hold it in good faith [and] that when it was over and there was no more risk to [Gray] as being the new property owner, then it would be torn up."

However, assuming Gray would have testified in this manner, the testimony would have been completely beside the point. The crucial question is not whether Davis and Gray agreed to have a note. The question is whether Motley was incompetent in fashioning the arrangement between the parties in the manner that he did. We will deal with that question shortly, but it suffices to say at this point that, even had Gray testified as Motley says she would, the outcome of the inquiry into Motley's competence would be the same. Hence, Gray's testimony would not have been material.

Motley's counsel also proffered that Gray would corroborate Motley "about insurance being kept in place that [Davis] had on the property."  This related to Motley's alleged failure, noted supra, promptly to furnish "Proof of Insurance coverage and paid receipt" to Suncoast in connection with Gray's assumption of the existing deed of trust on the property.  Motley seeks to excuse his failure by saying that Gray and Davis "agreed that Davis' existing hazard insurance would remain in force and[,] therefore, it would not be necessary to send a new hazard insurance policy to the lender."  But the fact that the parties agreed a new policy would not be obtained does not excuse Motley's failure to furnish proof to Suncoast that the existing policy would remain in force and that the premium was current.  Hence, Gray's testimony would not have been material on this point either.

Motley acknowledges that whether a continuance should have been granted was a matter for the exercise of discretion on the part of the Disciplinary Board.  Under the circumstances, we find no abuse of discretion in the denial of Motley's motion for a continuance.

## C. Recusal

Motley sought to have two members of the Disciplinary Board recuse themselves from hearing the present proceeding

13

because they had participated in a previous disciplinary matter involving Motley that, at the time of the hearing, was before this Court on appeal. Motley argued that the two members became privy to information as a result of the prior proceeding that was inadmissible in the present case because the prior proceeding was on appeal and thus not final. The two members refused to step down, stating they felt "very strongly" that the "facts . . . raised" by Motley would not affect their impartiality and fairness in the present case.

Motley makes the same argument on appeal that he made before the Disciplinary Board. In addition, he says that "[i]t was highly prejudicial to have two panel members who had personal involvement with past disciplinary matters relating to [him]" and that "[i]t constituted error to deny [his] motion for [recusal]."

We disagree. In the first place, we think a member of the Disciplinary Board is subject to the same rules regarding recusal as are applicable to a trial judge, and Motley tacitly concedes this point. The fact that a trial judge is "'familiar with a party and his legal difficulties through prior judicial hearings . . . does not automatically or inferentially raise the issue of bias.'" Deahl v. Winchester Dep't of Soc. Servs., 224 Va. 664, 672-

14

73, 299 S.E.2d 863, 867 (1983) (quoting Barry v. Sigler, 373 F.2d 835, 836 (8th Cir. 1967)).

Whether a trial judge should recuse himself or herself involves the exercise of discretion. Deahl, 224 Va. at 672, 299 S.E.2d at 867. Nothing in this record indicates that the two members of the Disciplinary Board abused their discretion in refusing to recuse themselves. See Stockton v. Commonwealth, 227 Va. 124, 141, 314 S.E.2d 371, 382 (1984) (no abuse of discretion for trial judge to refuse to recuse himself because he had presided over previous trial in which defendant cursed him).

## D. Sufficiency of Evidence

### 1. The Real Estate Transaction

Motley's conduct in the real estate transaction implicates former DR 6-101, which was styled "Competence and Promptness." DR 6-101(A) provided that a lawyer "shall undertake representation only in matters in which [he or she] can act with competence." DR 6-101(B) required that a lawyer "shall attend promptly to matters undertaken for a client," and DR 6-101(C) required a lawyer to "keep a client reasonably informed about matters in which the lawyer's services are being rendered."

In discussing the Disciplinary Board's finding that his conduct in handling the Davis-Gray real estate

15

transaction constituted incompetence, Motley reminds us that a violation of disciplinary rules must be established by clear proof, Blue v. Seventh Dist. Comm., 220 Va. 1056, 1062, 265 S.E.2d 753, 757 (1980), and he maintains that the finding of incompetence against him is not supported by such proof.  Motley says "[t]he evidence is that Davis and [Gray] agreed to the transaction and Motley was carrying out their requests."

If, as is apparent, Motley is content to rest his defense against the use of the disputed promissory note and deed of trust upon the proposition that Davis and Gray agreed to the transaction and Motley was merely carrying out their requests, the defense simply will not suffice. What Motley permitted Davis to sign does not even conform to what he says the parties agreed to.

Motley says that "the parties agreed that Davis would execute a deed of trust note in the amount of $3,366.78 to protect [Gray] in the event a lien was placed on the property due to Davis' default on the debt" and that Gray "would destroy the note when the debt for the windows was satisfied."  But nothing in the note Davis signed makes its payment conditional upon the placing of a lien on the property nor does the note contain any provision requiring

Gray to destroy it when the debt for the windows was satisfied.

Rather, the note Motley permitted Davis to sign is a fully negotiable instrument dated February 15, 1996, containing an unconditional promise to pay the fixed sum of $3,366.78 in monthly installments of $98 each beginning March 1, 1996, with payment in full due June 1, 1998. The note not only created an indebtedness requiring Davis to pay Gray $3,366.78 when Davis owed Gray no money at all, but it also subjected Davis to the danger of double liability if the note found its way into the hands of a holder in due course.

Furthermore, it is obvious from a reading of Davis's testimony that she had no idea what she was getting herself into when she signed the note. She was asked by a member of the Disciplinary Board why she "signed a note promising to pay Ms. Gray money." She replied, "I wasn't paying Ms. Gray money. I was continuing to pay that bill [to the finance company]." Asked again why she signed the note, she said "[b]ecause that was my bill. It was a bill that I had created." Asked if she understood that the note "doesn't say" that she "really didn't have to pay Ms. Gray" but she "had to pay somebody else," she replied, "[n]o, I didn't."

17

It is also obvious that Motley himself neither understood the nature of the situation he created for Davis nor appreciated the potential harm she could have suffered. A member of the Disciplinary Board asked Motley whether he had any concerns "that the note might be negotiated with a holder in due course," and he replied, "I did, but you can question anything, but can you win on it?"

Motley concedes Davis was his client. As a result of that relationship, he owed her the duty to draft closing papers that accurately reflected the conditional nature of the liability she had agreed to undertake in favor of Gray. He also owed her the duty, in any event, to explain to her the true nature and potential consequences of what he actually prepared for her to sign and to advise her against signing anything to her prejudice. If this advice had created a conflict of interest because of his dual role in representing both Davis and Gray, then it would have been his duty to withdraw from representation of both.

Motley's failure to prepare papers conforming to the conditional nature of the liability Davis had agreed to undertake constituted a violation of his duty under DR 6-101(A)(1) to "act with competence," and his failure to advise her of the true nature and potential consequences of what he actually prepared is both incompetence under DR 6-

101(A)(1) and a violation of his duty under DR 6-101(C) to "keep a client reasonably informed about matters in which the lawyer's services are being rendered." And we think all these violations have been established by clear proof.

We also think the evidence clearly and convincingly established that Motley violated DR 6-101(B) by failing to "attend promptly" to the matter of forwarding to Suncoast "Proof of Insurance coverage and paid receipt." As noted previously, Motley attempts to excuse this failure by saying that, because Davis and Gray agreed to continue the existing policy, there was no need to send the trust holder a new policy. However, the trust holder did not require proof of a new policy but only proof that there was "Insurance coverage," a requirement that could have been satisfied easily with proof that the existing policy remained in force. And Motley clearly did not furnish that proof.

## 2. Trust Account Problems

### (a) DR 9-102(A) and (B) — Preserving Identity of Funds

Motley argues there is no clear and convincing evidence that he put client funds into his personal account. However, as noted previously, Motley conceded before the Disciplinary Board that he deposited the $1,000 check he received from Gray into his personal account. He

says now that he "inadvertently" made this deposit. Also, he argues that because the $1,000 check was subsequently returned for insufficient funds and a check is not legal tender, no client funds were actually deposited into his personal account. This is an ingenious argument, but lacking in merit. Furthermore, the argument ignores the fact, also conceded by Motley, that he deposited $3,026.27 of personal funds into his trust account, which is likewise prohibited by DR 9-102(A) except in circumstances not pertinent here.

Motley also argues there is no clear and convincing evidence that he failed to keep a record of client funds coming into his possession, as required by DR 9-102(B)(3). He says his records are incomplete but do indicate "whenever [he] deposited client funds into his account." However, the record shows clearly that Motley failed to maintain a subsidiary ledger card or an equivalent for the Davis-Gray real estate transaction, as required by DR 9-103(A).

(b) DR 9-103 – Record-Keeping Requirements

The Disciplinary Board found that Motley had violated DRs 9-102(A), -102(B)(3), -103(A)(1),(2), and (3), and -103(B)(2),(3),(4),(5), and (6), all relating to record-keeping and accounting procedures. Motley says that he had

20

trust ledger cards, bank statements, and other records "that were used to account for client funds deposited in trust and disbursements" which, "[a]lthough . . . incomplete," did provide "a good faith attempt to account for the deposit and disbursement of client funds held in trust."

However, the analysis made of Motley's records by Campbell, the State Bar investigator, for the period July 1, 1995, through June 30, 1996, disclosed numerous instances of incompleteness in subsidiary ledgers and cash disbursement journals. Similarly, cash receipts journals or equivalent records failed to provide identification of the sources of funds deposited. Also, Motley would deposit one amount but "[h]is ledger denote[d] another amount."

Campbell found that "Motley was out of trust, on numerous occasions, on each of [numerous] clients." A "look at . . . the checks that were pending, and . . . how much money was in the checking account [showed] there was not enough money to cover the checks." For example, with respect to the handling of a settlement for one client, there were insufficient funds in the trust account to cover checks written on the settlement on thirty-two different occasions between August 15, 1995, and November 13, 1995, and, for another client, there were insufficient funds to

cover checks written on the settlement on at least twenty-seven separate occasions between October 19, 1995, and March 25, 1996.

## F. Mitigating Circumstances and Excessiveness of Sanction

Motley argues that the eighteen-month license suspension "imposed by the [Disciplinary] Board was excessive and contrary to law because the Board failed to consider mitigating evidence."  According to Motley, the Disciplinary Board failed to consider evidence that he engaged in no deliberate conduct; did not violate any court order; did not steal any client funds or cause harm to any client; no longer handles real estate matters; and acknowledged the need for improvement in the handling of his trust accounts, has instituted improved accounting procedures, and is willing to make other necessary improvements.

It is true, as Motley says, that neither in the Disciplinary Board's oral decision nor in its written order is there any mention of mitigating evidence.  However, we are aware of no requirement that the Board state that it considered mitigating evidence when announcing a decision or issuing an order that disciplines an attorney.  And a failure to state that mitigating evidence was considered does not mean that it was not considered.

22

Furthermore, we are of opinion that the sanction imposed by the Disciplinary Board was not excessive even in light of the mitigating evidence.  Motley's mishandling of the Davis-Gray real estate transaction and his mismanagement of his trust account constitute serious violations of the disciplinary rules, justifying, when coupled with his disciplinary record,[9] the imposition of serious disciplinary treatment.

For the foregoing reasons, we will affirm the order of the Disciplinary Board.

<u>Affirmed</u>.

---

[9] In 1986, the Third District Committee dismissed a complaint against Motley with terms; in 1991, the Committee imposed a private reprimand upon Motley with terms; and in 1992, the Committee dismissed another complaint against Motley with terms.

23