# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Alfredo Prieto

March 8, 2010

Case No. (Criminal) FE 2005-1764

By Judge Randy I. Bellows

The matter comes before the Court on the defendant's motion to recuse this Court from the resentencing proceeding in the above-entitled matter. The Court has received and considered the motion of the defendant and the opposition thereto filed by the Commonwealth. On February 25, 2010, the Court heard oral argument on the defendant's motion. At the conclusion of oral argument, the Court advised the parties that the matter would be taken under advisement and the Court would issue a letter opinion. The matter, therefore, is ripe for decision.

For the reasons stated below, the defendant's motion to recuse the Court is denied.

## I. Procedural History

On November 21, 2005, the defendant was indicted and charged with two counts of capital murder, two counts of use of a firearm in the commission of a felony, rape, and grand larceny. On May 29, 2007, trial began before the Honorable Dennis J. Smith. Judge Smith divided the trial into three

phases, to wit, a guilt phase, a mental retardation phase, and a sentencing phase. On June 18, 2007, the defendant was found guilty on all counts. On July 3, 2007, due to juror misconduct, the case was mistried. On July 12, 2007, due to Judge Smith's assumption of the position of Chief Judge and its associated administrative responsibilities, the case was reassigned to this Court.

On January 7, 2008, the retrial began. This Court divided the trial into two phases, to wit, a guilt phase and a combined mental retardation/sentencing phase. On February 6, 2008, the defendant was again found guilty on all counts. On March 3, 2008, the jury returned its verdict on mental retardation/sentencing. First, the jury found that the defendant had failed to prove that he was mentally retarded. Second, the jury sentenced the defendant to death on each of the capital murders. Third, as to the remaining convictions, the jury sentenced the defendant to life in prison on the rape conviction, to three years on each of the firearms convictions, and to twenty years on the grand larceny conviction.

On May 23, 2008, the Court held the sentencing hearing. This followed the receipt of a pre-sentence report and the defendant's sentencing memorandum. After hearing argument and giving the defendant the opportunity to make a statement, which he declined, the Court ruled that good cause had not been shown to set aside the sentence of death and, therefore, sentenced the defendant to death on each of the capital murder counts. In addition, the Court sentenced the defendant to three years on each of the firearms counts, to twenty years on the grand larceny count, and to life in prison on the rape count, all sentences to run consecutively.

On September 18, 2009, the Supreme Court of Virginia affirmed each of the defendant's convictions. However, because the Supreme Court found error in the sentencing phase, it reversed the two sentences of death and remanded the case to the circuit court for a new sentencing proceeding on the capital murder convictions.

On December 29, 2009, the Court held a hearing to set a date for the resentencing proceeding. The resentencing proceeding was set for September 7, 2010. In addition, the Court set a briefing and hearing schedule for the instant recusal motion.

On January 29, 2010, the defendant filed his Motion for Recusal of Judge Randy I. Bellows. The defendant sought recusal of the Court on two grounds: "(1) Judge Bellows presided over all stages of the defendant's second trial, which resulted in a capital murder conviction and death sentence; and (2) Judge Bellows' involvement in, and statements made during, that trial and sentencing create a reasonable appearance of bias against the defendant." (Def.'s Motion for Recusal 1.) Although the defendant makes reference to "statements made during . . . that trial," he does not cite to, or rely upon, any statements made by the Court during the two month trial. (Def.'s Motion for Recusal 1.) Thus, it appears that this motion is based solely on

statements made by the Court during the May 23, 2008, sentencing hearing. (*See generally* Def.'s Motion for Recusal.) In support of its motion, the defendant cited twelve lines of the sentencing transcript and argued that these statements by the Court, which are variously described as "prepared," "forceful[]," "heart-felt," "highly emotional," and "emotionally-laden," create "a reasonable appearance of partiality for any future proceeding." As a result of the nature of these statements, the defendant argues, "the public can have no confidence that when faced with these issues again, the decision will be made on a clean slate, unaffected by what went before."

In an accompanying affidavit, the defendant's counsel stated that they were both struck by the "great emotion with which the court ruled on Mr. Prieto's sentencing position," that this display of emotion was "striking to counsel," that they cannot recall a case in which the trial court "seemed so emotional in imposing a sentence," that the court had read a prepared written statement addressing Mr. Prieto's sentencing arguments, and that, in its recitation, "the court appeared to become so over-wrought that, as counsel recalls, the court was forced to stop to regain composure before continuing." (Greenspun and Shapiro Aff. 1-2.) Finally, counsel states that "[t]he anger the court held for Mr. Prieto and its firm personal belief that death was deserved and was the correct sentence was unmistakable." (Greenspun and Shapiro Aff. 2.)

On February 16, 2010, the Commonwealth filed its response to the defendant's recusal motion. The Commonwealth opposed recusal of the Court and argued that the case law of Virginia is clear that there is no *per se* rule requiring a judge to recuse himself from the retrial of a capital murder case. (Commonwealth's Resp. to Motion for Recusal 1.) Further, the Commonwealth argued that none of the statements made by the Court during sentencing "show[] a bias or prejudice against the Defendant that would deny the Defendant a fair trial or cause the public to lack confidence in his decision." (Commonwealth's Resp. to Motion for Recusal 2.)

## II. *Discussion*

First, the Court will lay out the general principles of law governing the resolution of a recusal motion. Second, the Court will review the "whole record" of these proceedings, as required by the recusal case law described below. Third, the Court will discuss in greater detail the arguments of defense counsel and the cases upon which they principally rely. Finally, the Court will give its decision on the matter.

A. *Case Law Governing Recusal Decisions*

1. *The Right to a Fair Trial before a Fair Tribunal*

Impartiality lies at the core of a fair trial. A judge "must possess neither actual nor apparent bias against a party." *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003). A trial judge must be a "neutral," *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), and "a fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). "Stated succinctly, the cornerstone of the American judicial system is the right to a fair and impartial process." *Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005). That right does not end with a jury's verdict but continues through sentencing. *See, e.g., Billips v. Commonwealth*, 48 Va. App. 278, 290, 630 S.E.2d 340, 346 (2006) ("The due process right to a fair tribunal applies to both the guilt and sentencing phases of a criminal trial." (citation omitted)).

Toward that end, a judge "must diligently avoid not only impropriety but a reasonable appearance of impropriety as well." *Davis v. Commonwealth*, 21 Va. App. 587, 591, 466 S.E.2d 741, 743 (1996). This reflects the recognition that it is not sufficient for a proceeding to be just; it must also appear to be just. As Justice Frankfurter said in *Offutt v. United States*: "[J]ustice must satisfy the appearance of justice." 348 U.S. 11, 14, 75 S. Ct. 11, 99 L. Ed. 11 (1954).

This principle is reflected in the Canons of Judicial Conduct. Rule 3 of the Canons of Judicial Conduct for the State of Virginia reads, in part, as follows:

> (E)(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
> (a) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Va. Sup. Ct. R., pt. 6, sec. III, Canon 3 (2009).

As the Court of Appeals stated in *Davis*, "The requirement of this Canon is clear; a judge must diligently avoid not only impropriety but a reasonable appearance of impropriety as well." 21 Va. App. at 591. While the Supreme Court of Virginia has made clear that it is the case law of the Commonwealth that determines whether a failure to recuse warrants reversal of a judgment, the Canons are "helpful" in resolving a recusal motion. *See Commonwealth v. Jackson*, 267 Va. 226, 229, 590 S.E.2d 518, 519 (2004).

## 2. *The Burden of Proof*

The party seeking recusal of a judge "has the burden of proving the judge's bias or prejudice." *Commonwealth v. Jackson*, 267 Va. 226, 229, 590 S.E.2d 518, 520-21 (2004).

## 3. *The Decision Is Made by the Trial Judge*

The case law of the Commonwealth is clear that the decision whether to recuse is made by the trial judge in the reasonable exercise of his or her discretion. *See, e.g., Justus v. Commonwealth*, 222 Va. 667, 674, 283 S.E.2d 905, 908 (1981) ("When challenged for bias and prejudice, it is for the trial court to search his conscience and decide whether to recuse himself from the case.") (citing *Walker v. States*, 241 Ark. 300, 309-10, 241 Ark. 663, 408 S.W.2d 905 (1967)); *Jackson v. Commonwealth*, 267 Va. 226, 229, 590 S.E.2d 518, 520 (2004) ("In the absence of proof of actual bias, recusal is properly within the discretion of the trial judge." (citations omitted)); *Davis v. Commonwealth*, 21 Va. App. 587, 591, 466 S.E.2d 741, 743 (1996) ("Exactly when a judge's impartiality might reasonably be called into question is a determination to be made by that judge in the exercise of his or her sound discretion."); *Wilson v. Commonwealth*, 46 Va. App. 408, 430, 617 S.E.2d 431, 445 (2005) ("In Virginia, whether a trial judge should recuse himself or herself is measured by whether he or she harbors 'such bias or prejudice as would deny the defendant a fair trial,' and is a matter left to the reasonable discretion of the trial court") (citations omitted); *Pearson v. Vanlowe*, 0561-04-4 2005 Va. App. LEXIS 91, *18 (2005) ("Decisions regarding a judge's impartiality are to be made by the judge in the exercise of his or her discretion and will be reversed on appeal only upon a finding that the court abused its discretion in deciding the question.").

## 4. *The Standard for Recusal*

In the Commonwealth, a trial judge asked to recuse himself "must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny the defendant a fair trial." *Justus v. Commonwealth*, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981). Significantly, "[i]n exercising his [or her] discretion in this regard, the judge must be guided not only by the true state of his [or her] impartiality, but also by the public perception of his [or her] fairness, in order that public confidence in the integrity of the judiciary may be maintained." *Stamper v. Commonwealth*, 228 Va. 707, 714, 324 S.E.2d 682, 686 (1985).

Other courts have used the following formulation to judge recusal decisions: "Would a person of ordinary prudence in the judge's position knowing all of the facts known to the judge find that there is a reasonable

basis for questioning the judge's impartiality." *State v. Moore*, 988 So. 2d 597, 599 (Ala. 2008); *see also United States v. Mikalajunas*, 91-5119 1992 U.S. App. LEXIS 21054, *6 (4th Cir. 1992) ("[J]udges should employ an objective standard to determine impartiality. That is, a judge should recuse himself or herself whenever a reasonable person, with knowledge of all the facts of the case, would question the judge's impartiality." (citation omitted)).

Because of its pertinence to the instant motion, the Court would also note that certain claims have been established not to be a valid basis for recusal.

First, recusal is not warranted simply because the trial judge upon a remand is to be the same judge who originally imposed the death penalty. *Justus v. Commonwealth*, 222 Va. at 673 ("We do not feel that a *per se* rule requiring a judge to recuse himself on retrial of a capital murder case is necessary to assure a fair trial."); *see also State v. Moore*, 988 So. 2d 597, 601 (2008) ("A trial judge need not recuse himself solely on the ground that he was the 'same trial judge who had heard the case and imposed the death penalty' in the defendant's prior trial.") (quoting *Ex parte Whisenhant*, 555 So. 2d 235, 238 (Ala. 1989)).

Second, the formation and expression of an opinion based on information acquired by the Court in the course of judicial proceedings is almost never a basis for recusal. *See Slayton v. Commonwealth*, 185 Va. 371, 376, 38 S.E.2d 485, 488 (1946) ("It is well settled that a judge is not disqualified to sit in a criminal case because, in the disposition of a matter arising out of the same facts, he has formed or expressed an opinion as to the guilt of the accused. Frequently, in the disposition of cases, both civil and criminal, a judge is called upon to form and express an opinion upon a matter or issue which may come before him in a subsequent proceeding arising out of the same state of facts. The courts are practically unanimous in the view that neither the forming nor the expression of such a conclusion, under such circumstances, disqualifies a judge in the subsequent matter. . . ." (citations omitted)); *see also Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116 (1979); *Buchanan v. Buchanan*, 14 Va. App. 53, 415 S.E.2d 237 (1992). Similarly, a judge's familiarity with a party through prior judicial proceedings raises no issue of bias. *See, e.g., Deahl v. Winchester Dept. of Social Services*, 224 Va. 664, 299 S.E.2d 863 (1983); *Stamper v. Commonwealth*, 228 Va. 707, 324 S.E.2d 682 (1985); *Motley v. Virginia State Bar*, 260 Va. 251, 536 S.E.2d 101 (2000).

Third, adverse rulings provide no basis for recusal. As the Supreme Court of Virginia noted in *Stamper*, a party seeking recusal may not rely upon adverse rulings by the trial court as proof of prejudice. 228 Va. at 714. "[I]f this were the criterion of prejudice, no rulings could ever be made which a party opposes." *Id.* A "discontented litigant," *Ex parte American Steel Barrel Co.*, 230 U.S. 35, 44, 33 S. Ct. 1007, 57 L. Ed. 1379 (1913), or a "disgruntled litigant[ ]," *Moore v. South Carolina*, Nos. 88-6676, 90-

6539, 1991 U.S. App. LEXIS 2039, *9 (4th Cir. 1991), has the remedy of appellate review, not recusal. See also *Kreling v. Superior Court of Los Angeles County*, 25 Cal. 2d 305, 312, 153 P.2d 734 (1944) ("If a judge in finding facts falls into error by basing his conclusions upon inadmissible evidence, such an action may constitute sufficient ground for a reversal of the judgment upon appeal, but will not support a charge of disqualification. . . .").

Fourth, in examining the question of whether a trial judge has exhibited "personal bias or prejudice," courts almost always require proof that the judge was influenced by what is commonly referred to as an "extrajudicial source." *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) (such bias must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case."). *See also Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 672 (4th Cir. 1982) ("The bias or prejudice that would require a judge to recuse himself must come from an extrajudicial source and affect the judge's opinion on the merits. . . . There is no evidence in this case that the judge's decisions were affected by anything other than the evidence presented by the parties. . . ."); *Mikalajunas*, 91-5119, 1992 U.S. App. LEXIS 21054 at *10 ("Furthermore, the source of his perceived bias was extra-judicial; it was a bias derived from personal objections to the governing law."); *Ex parte Monsanto Co.*, 862 So. 2d 595, 625 (Ala. 2003) ("The evidence presented in Monsanto's petition does not suggest that Judge Laird exhibited any bias before the commencement of this action or from any source outside the proceedings."); *In re Evans*, 411 A.2d 984, 995 (D.C. App. 1980) ("Ordinarily, a trial judge is not required to recuse when an affiant alleges bias arising from a source within the `four corners of the courtroom.' The `four corners of the courtroom' test is really an alternative formulation of the rule that bias must be personal rather than judicial before recusal will be required. The proper distinction is `between a judicial determination derived from evidence and lengthy proceedings before the court, and a determination not so founded upon facts brought forth in court, but based on attitudes and conceptions that have their origins in sources beyond the four corners of the courtroom'." (citations omitted)). While the "extrajudicial source" requirement has been qualified to some extent, it still remains a persistent theme in the jurisprudence of recusal law. *Compare Liteky v. United States*, 510 U.S. 540, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1990), *with United States v. Howard*, 218 F.3d 556 (6th Cir. 2000).

*5. The Recusal Decision Is Based on the "Entire Course of Judicial Proceedings"*

The defendant's recusal motion is based on certain comments which the Court made at sentencing. However, a recusal decision must be based

on the entire record and not just isolated excerpts from it. *See Bigby v. Dretke*, 402 F.3d 551, 560 (5th Cir. 2005) (The appellate court, in reviewing a disqualification issue, "must examine the record for indications of actual bias on the part of the trial judge."); *United States v. Allen*, 587 F.3d 246 (5th Cir. 2009) ("In evaluating whether a judge should have been recused, our 'review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents.' The record as a whole does not support a conclusion that the trial judge should have recused himself." (citation omitted)); *State v. Ortiz*, 91 Haw. 181, 195, 981 P.2d 1127 (1999) ("When the affidavit to disqualify refers to matters of record, however, we may consider the entire record in making our determination." (citations omitted)).

Thus, in determining the "public perception" of the Court's "fairness," *see Stamper*, 228 Va. 707, 324 S.E.2d 682 (1985), a party cannot simply pick and choose a particular event in a trial but, rather, must examine the whole record. It is for that reason that many cases have stated that "a judge should recuse himself or herself whenever a reasonable person, *with knowledge of all the facts of the case*, would question the judge's impartiality." *United States v. Mikalajunas*, No. 91-5119, 1992 U.S. App. LEXIS 21054, *6 (4th Cir. 1992) (emphasis added).

## B. *The Entire Record*

### 1. *Pre-trial and Trial Proceedings*

This Court was assigned this case on July 12, 2007, and issued a final order in the case on May 23, 2008. During that ten month period, this Court made numerous decisions and took numerous actions that a member of the public "with knowledge of all the facts of the case" could only view as evidence of scrupulous fairness.

For example the Court, sometimes over the Commonwealth's objection, made numerous decisions designed to insure that the defendant had the assistance and benefit of a broad variety of experts. On December 6, 2007, the Court appointed a defense DNA expert and a defense mental health expert. (Order, December 6, 2007.) On January 7, 2008, the Court appointed Dr. Stewart as a mental health expert and authorized expenditures of $12,000 for Dr. Stewart. (Order January 7, 2008.) On January 7, 2008, the Court appointed Daniel Vasquez as a defense rebuttal expert concerning San Quentin Penitentiary Death Row. (Order January 7, 2008.) On February 8, 2008, the Court authorized the payment of expenses and fees to the defendant's DNA expert, as well as for one of the defendant's mental health experts, Dr. Stewart. On February 29, 2008, and again on March 14, 2008, the Court issued additional orders authorizing payment for another defense mental health expert, Dr. Weinstein. (Orders of February 29, 2008, and

March 14, 2008.) On April 7, 2008, the Court authorized payment of fees to the defendant's San Quentin expert. (Order April 7, 2008.)

Similarly, the Court repeatedly authorized the payment of fees so that the defendant would have the benefit of investigative assistance. (Orders of January 22, 2008, February 11, 2008, and March 14, 2008.)

On January 23, 2008, the Court approved expenses for visa applications for potential defense witnesses. (Order January 23, 2008.)

On February 1, 2008, the Court ruled on the defendant's motion to suppress, which the Court granted in part and denied in part, specifically excluding testimony to be offered by Lt. Perez. (Order February 1, 2008.)

The Court was similarly fair in its discovery decisions. (*See e.g.*, Order December 19, 2007, granting discovery in part.)

During the trial, the Court made hundreds of evidentiary and procedural rulings, many of which sustained positions asserted by the defense. For example: (1) Over the Commonwealth's objection and despite the fact that the witness had been excluded from testifying in the prior trial, this Court permitted the defense to call the Executive Director of The ARC (an advocacy organization for intellectually challenged individuals) to rebut the testimony of the Commonwealth's mental retardation expert. (Trial Tr. 34-72, February 26, 2008). (2) The Court denied the Commonwealth admission of certain sentencing documents related to the defendant's California capital murder conviction in order to avoid prejudice to the defendant. (3) Over the Commonwealth's objection, the Court admitted a transcript of a telephone call which the defendant sought to use to impeach the testimony of a key Commonwealth expert. (Trial Tr. 1-25, February 28, 2010.) (4) The Court permitted the testimony of a defense pathologist despite objections from the Commonwealth that they had not been given proper notice. (Trial Tr. 126-141, January 29, 2008.) (5) Over the Commonwealth's objection, the Court ruled that the defendant could move in exhibits yet still preserve his motion to strike. (Trial Tr. 10, January 23, 2008.)

This Court took three steps that illustrate the Court's commitment to insuring that the defendant would continue to be represented by able, competent, and zealous counsel. First, on January 11, 2008, the Court authorized monthly billing of defense counsel fees, rather than requiring counsel, as in other cases, to submit their voucher at the conclusion of litigation. (Order January 11, 2008.) Second, the Court consistently acted on defense counsel's vouchers promptly upon their receipt, so payment would not be delayed. (See, e.g., Orders of February 29, 2008, April 7, 2008, and November 12, 2008.) Third, even before concluding the defendant's sentencing hearing, the Court appointed defense counsel to continue as counsel on appeal and to continue to represent the defendant in his post-trial motions. (Trial Tr. 39, May 23, 2008.)

During trial, the Court took various measures to accommodate the schedules of the experts for both the Commonwealth and the defense. (*See, e.g.*, Trial Tr. 179-89, February 7, 2008.)

## 2. *Post-trial Proceedings*

After trial, defense counsel raised with the Court an issue related to one of the defendant's mental health experts, Dr. Stewart. Defense counsel advised the Court that the expert's fee was more than $10,000 over what the Court had authorized, with the additional expense attributable largely to unavoidable delays. Over the objection of the Commonwealth, the Court found the additional costs to be "warranted, reasonable, and necessary" and approved the additional requested payment. In addition, the defense sought expert witness fees for two additional experts, Dr. Fowler and Dr. Merikangas. The Commonwealth opposed the fees, asserting they were excessive. The Court ordered payment of the defense expert fees. In addition, the defense sought expert witness fees for Dr. Eyer, another expert related to the defendant's mental retardation assertions. The Court ordered payment of these additional fees. (Order October 10, 2008.)

After trial, although the Court did not permit defense counsel to be present at the probation officer's interview of the defendant, the Court did authorize defense counsel to send a letter to the probation officer setting "parameters" as to issues. which should not be raised in their interview of the defendant. (Trial Tr. 38, May 2, 2008.)

In addition, in order to facilitate the defendant's post-trial appeals, the Court approved *pro hac vice* applications for several attorneys to assist in the defendant's post-trial proceedings. (*See e.g.*, Trial Tr. 1-2, August 13, 2008; Order August 13, 2008.)

## 3. *The Sentencing Proceeding*

The defendant's recusal motion quotes from twelve lines of the sentencing transcript. Here is what happened at sentencing from beginning to end. The Court called the case, noted the presence of counsel and the defendant, and announced the dates for the filing of post-trial motions and the motions hearing. The Court reviewed the jury's verdict at both the guilt phase and the sentencing phase of the trial, including the jury's findings regarding future dangerousness and vileness. The Court then stated that it had previously ordered a presentence report and noted the presence of the probation officer. The Court then stated:

> Virginia Code § 19.2-264.5 also states that, quote, "after consideration of the report and upon good cause shown, the Court may set aside the

sentence of death and impose a sentence of imprisonment for life," close quote.

This is precisely what defense counsel requests this Court to do in their sentencing memorandum filed with the Court. Therefore, the purpose of today's hearing, among other matters, is to sentence the Defendant on all six counts for which he stands convicted and, in particular, as to Counts One and Four, the capital murder convictions, to determine whether to set aside the sentence of death and impose a sentence of imprisonment for life.

(Trial Tr. 5, May 23, 2008.)

The Court then asked counsel for both parties whether they had received the presentence report and whether the defendant had an opportunity to review it with Mr. Prieto. The Court then asked defense counsel whether it had any additions, deletions, or corrections to the presentence report. Defense counsel responded that there were several matters it wished to bring up. Defense counsel noted several objections. The Court then modified the presentence report in two respects: first, to reflect the defendant's religious preference; and, second, to note that the reason the defendant did not cooperate with the probation officer is upon the advice of counsel. Then the Court asked the Commonwealth whether it had any additions, deletions, or corrections to the presentence report, which it did not.

The Court then inquired of both parties whether they wished to question the probation officer, which both parties declined. At that point, the Court noted that it would make the presentence report a part of the record of these proceedings. The Court then asked the Commonwealth whether it intended to present additional victim-impact testimony pursuant to §§ 19.2-264.4 and 19.2-295.3. The Commonwealth indicated that it did not. At that point, the Court invited the Commonwealth to make its sentencing argument. The Commonwealth argued for the Court to enter judgment in accordance with all of the jury's verdicts.

Following the conclusion of the Commonwealth's sentencing argument, the Court said the following:

> I will now hear from counsel for the Defendant. I would note that defense counsel has filed a sentencing memorandum which I have carefully reviewed. That memorandum requests the Court to find good cause to set aside the sentences of death and impose sentences of life in prison.
>
> In support of that request, defense counsel has made nine arguments in his sentencing memorandum: first, that the Court as, quote, "an experienced sentencing authority," close quote, is in a better position than the jury to determine whether the Defendant should be put to death;

Second, that the Defendant did not engage in criminal activity during the first sixteen years of his life;

Third, that his upbringing and adolescence was, quote, "horrid" and that he lived in poverty and with abuse and was exposed to war and death on a daily basis, including the murder of a loved one;

Four, that the Defendant's cognitive abilities were very limited;

Five, that the murders committed by the Defendant including the other crimes' evidence occurred during a discreet [ ] period of six years, ages eighteen to twenty four;

Six, that in the intervening years, for most of which the Defendant has been on California's death row, that he has become a changed man, has become active in the prison church and has become genuinely interested in religion;

Seven, that he is valued by his family;

Eight, that he is at very low risk for future danger based on studies presented to the Court, based on Mr. Prieto's age and lack of violence, the alleged lack of violence on death row;

And finally nine, that there was evidence in this trial that Mr. Prieto, quote, "was not the shooter," close quote, which even though the defense states that "we fully understand that the issue has been resolved against Mr. Prieto by the jury," that is a quote, ought to leave the Court to have lingering doubt as to whether the Defendant was the shooter and the related argument that certain hair evidence was lost at some point, the evidence that the defense argues would point to another individual as the shooter, and on that basis, the Court should impose a sentence of life instead of death.

That is my understanding of the arguments presented by the defense in their memorandum.

I will now hear from defense counsel and you are free, of course, to make any additional arguments you wish at this time as well as to supplement the arguments in your memorandum as you wish.

(Trial Tr. 13-15, May 23, 2008.)

Mr. Shapiro spoke first on behalf of the defendant and argued that the mitigating evidence before the Court warranted the Court in exercising its authority to set aside the jury's sentence of death. Mr. Greenspun then argued on behalf of the defendant, asserting that it was "simply wrong to impose a sentence of death on Alfredo Prieto until the mystery of those [missing] hairs is solved" and that the Court should not impose the death penalty because the Commonwealth had failed to prove its case "beyond all doubt."

Following the conclusion of Mr. Greenspun's argument, the Court inquired of the Commonwealth whether there was anything additional it

wished to say by way of argument, and Mr. Horan made some additional comments.

Following this, the Court asked Mr. Prieto to stand and made the following inquiry:

> Mr. Prieto, do you wish to make a statement to the Court or to say anything to the Court prior to sentencing? This is your opportunity to say anything you wish to the Court for it to take into account in determining your sentence.

(Trial Tr. 31, May 23, 2008.)

Mr. Prieto then advised the Court that he had nothing to say, based on the advice of counsel. The Court then asked Mr. Prieto whether there was any reason sentence should not be imposed "at this time." Mr. Prieto stated: "I do not believe so, Your Honor." (Trial Tr. 32, May 23, 2008.) The Court then put the same question to Mr. Shapiro and Mr. Greenspun, both of whom answered: "No, Your Honor." (Trial Tr. 32, May 23, 2008.) The Court then said the following:

> THE COURT: All right. Given the gravity of the decisions before me today, I believe it is incumbent on The Court not only to announce its decision but to explain it, which I will now proceed to do.
>
> As you all know 1 presided over the trial of this matter and, therefore, I heard the same evidence presented to the jury, including the evidence associated with the criminal acts for which the Defendant stands convicted as well as the evidence concerning the other criminal acts that were introduced in the penalty phase of the trial.
>
> I also heard all the evidence offered in mitigation of punishment, have carefully considered additional material to which the jury, of course, did not have access, the presentence report, the sentencing memorandum submitted by defense counsel, and the arguments of counsel today.
>
> In order to warrant the death penalty, it is not sufficient for a defendant to have committed a murder, rather he must have committed a murder under certain aggravating circumstances such as in this case a murder committed in the commission of or subsequent to a rape.
>
> Moreover, even if a defendant has committed a capital murder, the death penalty is only a possible penalty if the future dangerousness or vileness requirements are met. And even in these circumstances, a jury must carefully consider all mitigating circumstances that might [ ] [lead] it to the judgment that life in prison not death is the most appropriate penalty.
>
> Thus, at every stage of the process, the crimes and criminals eligible for the death penalty get smaller and smaller until we come to

that very small universe of crimes for which an appropriate penalty is death.

This reflects a judgment by the Commonwealth that the penalty of death should be reserved for the very worst of crimes. Unfortunately and tragically for the two families whose lives you have destroyed, Mr. Prieto, this is just such a case.

On the night you murdered — you executed these children and that is what they were, children, they were just coming out of college with the brightest prospects. They were in love with each and with their lives. They had barely begun to experience and enjoy the pleasures and satisfactions of life.

On the night you executed them, you turned the final moments of their lives on this earth into what can only be described as a living hell. It is simply beyond the powers of human comprehension to imagine the desperation, horror, and sheer terror that you inflicted on Ms. Raver and Mr. Fulton in the very last moments of their young lives.

As to the impact of your crimes on the survivors of the children you slaughtered, the families you left behind, one does not need to imagine what your killings did to them for they have borne witness in this courtroom to the devastation you have left in your wake.

The Code of Virginia § 19.2-264.4 permits the testimony of certain surviving family members concerning, quote, "the impact of the offense on their lives." In this case I have heard from a number of surviving family members including the mother and father of Warren Fulton, the mother of Rachael Raver, their siblings, and other family members.

The Code of Virginia further provides — that is § 19.2-299.1 — that among other matters, the surviving family members are permitted to describe to this Court the, quote, "nature and extent," close quote, of their psychological injuries, to detail any change in their personal welfare, lifestyle, or familial relationships as a result of the offense and provide such information as the Court may require related to the impact of the offense upon the victim.

This they have done, and what I have taken away from their testimony is the following: You have ruined their lives. It is clear from their testimony that there was nothing more precious nor of more incalculable value than their children. You stole their children from them, and you did so in a matter so unspeakable and horrific that, even today, two decades later, it remains an open and shattering wound.

It is a testament to the human spirit or at least the human endurance that these two families who you condemned to a lifetime of suffering and sadness beyond measure have somehow figured out a way to survive. That does not, however, diminish one whit the terrible impact

of your crimes on Ms. Raver's and Mr. Fulton's mother and father, on their brothers and sisters, on their aunts and uncles, and on their extended families. They will never, never recover from what you did. I could not put it better than Mrs. Fulton did when she testified that the bullet you put through her son lodged in her heart.

I will now turn to certain additional findings. I find that the crimes you committed were outrageously and wantonly vile, horrible, and inhuman as those terms are used in the statute.

I further find based on your prior history and based on the circumstances of these offenses that there is a probability that you will commit criminal acts of violence that would constitute a continuing threat to society.

I have carefully considered, Mr. Prieto, all the evidence which has been offered in mitigation of the crimes that you have committed. I have no doubt that your upbringing was difficult and that you were exposed to an unusual degree of violence. Nevertheless, I heard nothing in this trial, not your limited cognitive abilities, not the poverty of your youth, not your exposure to a war zone, not the violent death of your grandfather, and not any of the other circumstances which your counsel has put before me that mitigates in any respect the crimes that you committed and for which you now face the death penalty.

The jury determined that for these crimes you should be put to death. As I have already stated, the Code of Virginia vests in this Court the authority to set aside that sentence of death for, quote, "good cause shown."

After weighing all the aggravating and mitigating circumstances, after full consideration of the presentence report, the Defendant's sentencing memorandum, all the evidence presented at trial, the arguments presented today, and the applicable law, I find that good cause has not been shown to set aside the jury's verdict of death.

Further, I find that the penalty of death is the appropriate sentence for each of the capital murders which you have committed. Therefore, I shall not disturb the verdict of the jury, and I hereby sentence you to death on Count One, the capital murder of Rachel Raver, and to death on Count Four, the capital murder of Warren Fulton, III, and Rachel Raver.

The sentence of the Court on the remaining counts is as follows: on Count Two, the rape of Rachel Raver, I sentence you to life in prison; Count Three, the use of a firearm in the commission of murder of Rachel Raver, I sentence you to three years in prison.

Count Five, the use of a firearm in the commission of murder of Warren Fulton, III, I sentence you to three years in prison. Count Six, grand larceny, I sentence you to twenty years in prison. All counts are to run consecutive to each other.

(Trial Tr. 32-38, May 23, 2008.)

The specific statements which Defense counsel relies upon in his recusal motion are all drawn from this passage and are as follows: (1) "On the night you executed them, you turned the final moments of their lives on this earth into what can only be described as a living hell." (Def.'s Motion for Recusal 1); (2) "You stole their children from them and you did so in a matter so unspeakable and horrific that, even today, two decades later, it remains an open and shattering wound." (Def.'s Motion for Recusal 1): (3) "They will never, never recover from what you did." (Def.'s Motion for Recusal 2): (4) "I heard nothing in this trial, not your limited cognitive abilities, not the poverty of your youth, not your exposure to a war zone, not the violent death of your grandfather, and not any of the other circumstances which your counsel has put before me that mitigates in any respect the crimes that you committed. . . ." (Def.'s Motion for Recusal 2.)

The Court then addressed a number of other matters. First, it advised the defendant of his right of appeal, including his right to a free transcript and to court-appointed counsel. Second, the Court asked the defendant whether he wished the Court to appoint counsel, to which the defendant answered "Yes, sir." (Trial Tr. 39, May 23, 2008.) Third, after ascertaining that Mr. Greenspun and Mr. Shapiro intended to remain as the defendant's counsel, the Court appointed both of them to represent the defendant on appeal and in post-trial motions. Fourth, the Court imposed court costs on the defendant and ordered that they be docketed as a judgment against the defendant. Fifth, the Court ordered that the defendant submit to the taking of a blood sample for DNA analysis, as required by § 19.2-310.2. Sixth, the Court ordered the preservation of human biological evidence pursuant to § 19.2-270.1:1(b). Seventh, the Court certified that the defendant and defense counsel had been present at all times during the trial and during the penalty and sentencing phases of these proceedings. Eighth, the Court expressed "its appreciation to Mr. Greenspun and Mr. Shapiro for acceptance of this court appointment and for their capable and zealous representation of the Defendant." (Trial Tr. 40, May 23, 2008.) Ninth, the Court ordered that the defendant be given credit for time spent in confinement pursuant to § 53.1-187 of the Code of Virginia. Tenth, the Court, as required by § 53.1-232, set an execution date of October 3, 2008, and then immediately suspended it pending the resolution of post-trial motions. Finally, the Court asked defense counsel and counsel for the Commonwealth whether there was anything else that needed to be addressed. Both counsel indicated that there was not. The proceeding then concluded.

## 4. *The Appellate Proceedings*

While Defendant raised many issues on appeal, the Supreme Court of Virginia found "no reversible error in the guilt phase." Among other matters,

the Supreme Court found no error in this Court's denial of the defendant's motion to bar a retrial after the mistrial declared in the defendant's first trial, no error in this Court's denial of the defendant's motion for a pretrial determination of the mental retardation claim, no error in this Court's denial of the defendant's request to separate the sentencing phase of the trial into a mental retardation phase and a punishment phase, no error in this Court's denial of the defendant's motion to bar the death penalty due to the loss of hair evidence, no error in this Court's denial of defendant's motion to dismiss charges due to the loss of hair evidence, no error in this Court's denial of defendant's motion to strike based on the argument that there was insufficient evidence to prove that the defendant was the immediate perpetrator and that he committed the charged crimes, no error in this Court's admission of the defendant's criminal record, including his California death sentence, no error in this Court's upholding the constitutionality of the death penalty in Virginia, no error in this Court's refusal to give the defendant's proposed instructions regarding future dangerousness and vileness.

Consequently, the Supreme Court affirmed the defendant's convictions for each of the crimes with which he was charged. *Prieto v. Commonwealth*, 278 Va. 366, 682 S.E.2d 910 (2009). While the Supreme Court of Virginia did remand the case for resentencing, its decision was based on two errors in the verdict form, neither of which raise or suggest any issue of bias, prejudice, or partiality. *Id.*

## C. *The Defendant's Arguments in Support of Recusal*

It is important to state what the defendant asserts and, perhaps as importantly, what the defendant does not assert. As to the latter, it should be noted that:

(1) The defendant makes no claim that the Court was subject to extrajudicial influences or sources of information. A determination that a judge is personally biased based on extrajudicial sources is one of the most common bases for recusal. *See, e.g., Berger v. United States*, 255 U.S. 22, 28, 41 S. Ct. 230, 65 L. Ed. 481 (1921) (recusal granted where District Judge was alleged to have stated that the "hearts" of German Americans were "reeking with disloyalty" and that one would have to have "a very judicial mind, indeed, not to be prejudiced" against them); *United States v. Bakker*, 925 F.2d 728, 740-41 (4th Cir. 1991) (recusal granted where judge allowed his "personal sense of religiosity" to impact on his sentencing decision; the Court held: "[W]e are left with the apprehension that the imposition of a lengthy prison term here may have reflected the fact that the court's own sense of religious propriety had somehow been betrayed."); *United States v. Mikalajunas*, 91-5119 1992 U.S. App. LEXIS 21054, *10 (4th Cir. 1992) (recusal granted due to trial judge's "obstinacy toward sentencing under

[federal sentencing] guideline[s]," an "extra-judicial" bias "derived from personal objections to the governing law.").

(2) The defendant makes no claim that the Court was the recipient of prejudicial evidence now deemed inadmissible and would be unable to put such evidence out of his mind. Even where a Court has been the recipient of such inadmissible evidence, it does not mean that recusal is necessarily warranted. *See, e.g., Eckhart v. Commonwealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981) ("A judge, unlike a juror, is uniquely suited by training, experience, and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both." (citations omitted)); *Farren v. Commonwealth*, 30 Va. App. 234, 239-40, 516 S.E.2d 253, 256 (1999) ("As a practical matter, a trial judge is aware of his docket and routinely disregards matters that would be prejudicial if considered when deciding the case. For example, a trial judge must disregard evidence ruled inadmissible, though, in making the ruling, the judge will have learned the essence of the inadmissible evidence."); *see also, Mason v. Commonwealth*, 219 Va. 1091, 1099, 254 S.E.2d 116, 120 (1979) ("In non-jury cases, it will be presumed that the trial judge did not confuse the evidence in one case with that in another, and it will also be presumed, in the absence of an affirmative showing to the contrary, that only material and competent evidence is considered." (citations omitted)); *Overton v. Commonwealth*, 260 Va. 599, 604, 539 S.E.2d 421, 424 (2000) ("Overton insists that his request to die had to influence the court's sentencing determination. However, we are unwilling to disregard the court's unequivocal statement that it did not consider Overton's request."); *Billips v. Commonwealth*, 48 Va. App. 278, 292, 630 S.E.2d 340 (2006) (no recusal required where trial judge received a jury's sentencing decision improperly. The Court of Appeals noted that the "trial judge explicitly indicated that he could, and would, disregard the jury's recommendation in determining Billip's sentence" and "[w]e find no reason to disbelieve 'the court's unequivocal statement'." (citation omitted)).

(3) The defendant makes no claim that the Court demonstrated hostility or animosity toward defense counsel. The Court thanked Defense counsel at sentencing for their "capable and zealous" representation, (Trial Tr. 40, May 23, 2008), and noted in post-trial hearings its "high regard" for counsel. (Trial Tr. 29, September 18, 2008.) One can scour the entire record of this trial and not see a single word of hostility or animosity directed at defense counsel (or, for that matter, at the Commonwealth). While there is nothing remarkable about this, the Court notes this fact because a robust source of recusal litigation are those situations in which the trial judge is alleged to have treated counsel with hostility or animosity. *See, e.g., State v. Moore*, 988 So. 2d 597 (Ala. 2007). Even where there is demonstrable animosity between a judge and counsel, it is rare for it to warrant recusal.

*See, e.g., Terrell v. Commonwealth,* 12 Va. App. 285, 293, 403 S.E.2d 387, 391 (1991) ("[A]ssuming arguendo some animosity between the trial judge and defense counsel, that does not suggest that the trial judge would deny a fair trial to the lawyer's indigent client.").

(4) Finally, the defendant makes no claim that the Court relied upon inappropriate criteria or considerations in rendering its sentencing decision.

Each of these matters are common subjects of recusal motions; however, none are present or alleged in the instant case. Instead, these are the arguments that the defendant makes in support of recusal.

1. *The Court Used Strong Words in Describing Defendant's Crimes and Their Consequences*

The defendant asserts that the words the Court used during sentencing are evidence of bias and prejudice. The Court finds this argument to be without merit. There is no doubt the Court used strong and descriptive language, but the law is clear that this is not a basis for recusal. *See Moore v. South Carolina,* 90-6539 1991 U.S. App. LEXIS 2039, *16 (4th Cir. 1991) (no grounds for recusal where sentencing judge expressed himself "with some vehemence" regarding a crime that the appellate court itself characterized as vicious, crafty, merciless, and brutal); *United States v. Pulido,* 566 F.3d 52, 64 (1st Cir. 2009) (no grounds for recusal where Court described defendant as "thoroughly corrupt" and "utterly without redeeming qualities"); *United States v. Valenti,* 120 F. Supp. 80, 85 (D. N.J. 1954) ("The interdiction of the law is not the mere possession of definite views regarding the law, or the conduct of a party, or even a `prejudgment' of the matters in controversy, but rather an attitude of personal enmity towards the party affiant, or in favor of the adverse party to the detriment of the former. A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence.") (citing *Baskin v. Brown,* 174 F.2d 391 (4th Cir. 1949)); *State v. Ortiz,* 91 Haw. 181, 195, 981 P.2d 1127 (1999) (no grounds for recusal where court called defendant during sentencing a "menace to the community" and a "menace to society" and accused defendant of "devot[ing his] life to a pursuit of financial and material gain through crime"); *Anderson v. United States,* 754 A.2d 920, 925 (D.C. App. 2000) ("[Anderson] contends that the trial judge . . . castigated him during sentencing. These actions, which arose out of judicial rulings, are legally insufficient to establish bias requiring recusal of the trial judge."); *State v. Dumas,* 54 Conn. App. 780, 789, 739 A.2d 1251 (1999) (no grounds for recusal where Court described the defendant as a "marauder.").

Moreover, it is not at all unusual for courts to characterize crimes of this nature in explicit terms. *See. e.g., Mason v. Commonwealth* 219 Va. 1091, 1099, 254 S.E.2d 116, 121 (1979) ("It is difficult to conceive a more outrageously or wantonly vile, horrible, or inhuman course of conduct

than that of the defendant toward the victim."); *Bunch v. Commonwealth*, 225 Va. 423, 444, 304 S.E.2d 271, 283 (1983) ("The facts of this case display extreme baseness. Bunch, with no provocation whatsoever from his victim, planned her murder with cold-hearted calculation and larcenous intent. He carried out his murderous plan in true 'hit man' style of complete detachment, yet with a bizarre sexual reaction on his part. From these facts, the jury clearly could find that an utter depravity of mind accompanied the murder in this case.); *Strickler v. Commonwealth*, 241 Va. 482, 497, 404 S.E.2d 227, 237 (1999) ("Prior to the murder, the victim had been abducted by strangers, was terrified and called for help, was driven to a deserted field, was dragged, struggling, out of her car, was stripped naked, beaten, kicked, and sexually assaulted. She was forced to 'experience the horror of waiting for [her] execution.' These circumstances meet the statutory criteria for findings of both physical and mental torture, depravity of mind, and aggravated battery beyond the minimum necessary to accomplish the act of murder." (citations omitted)); *Muhammad v. Commonwealth*, 269 Va. 451, 611 S.E.2d 537, 585 (2005) ("With calculation, extensive planning, premeditation, and ruthless disregard for life, Muhammad carried out his cruel scheme of terror. . . . Muhammad inflicted death or massive injury upon these victims as he pursued his mission of terror. . . . [h]e [acted] with breathtaking cruelty. If society's ultimate penalty should be reserved for the most heinous offenses, accompanied by proof of vileness or future dangerousness, then surely, this case qualifies.").

Indeed, even defense counsel found it necessary to use sharp and categorical language to describe their client's crimes. "Those crimes were horrible and permanently damaged the survivors." (Def.'s Position on Sentence 2-3.) Similarly, in his sentencing argument, defense counsel stated: "There's a horrible interlude of six years, which is as shocking as it comes. . . ." (Trial Tr. 20, May 23. 2008.)

## 2. *The Court Explained its Sentencing Decision*

The defendant asserts that additional proof of bias and prejudice lies in the fact that the Court explained its rationale for its sentencing decision when it was not required by statute to do so. The defendant notes that the Court must only explain his sentencing order in a death penalty case when it sets aside the jury's verdict of death. *See* Va. Code § 19.2-264.5 (2010). Since this Court did not set aside the jury's verdict of death, the defendant argues that it was under no statutory obligation to explain its decision. Therefore, defendant asserts the fact that this Court "went out of [its] way" and "went beyond what the legislature has required" in order to explain its judgment constitutes further proof of partiality.

This argument is without merit. It is "entirely appropriate" for a judge imposing sentence to "comment on the nature and gravity of the offense."

*United States v. Guglielmi*, 819 F.2d 451, 456 (4th Cir. 1987). As the Supreme Court recently said in a different context: "To bring coherence to the process and to seek respect for the resulting judgment, judges often explain the reasons for their conclusions and rulings." *Caperton v. A. T. Massey Coal Co.*, 129 S. Ct. 2252, 2263, 173 L. Ed. 2d 1208 (2009). "It is up to the sentencing judge, within broad limits, to determine how much or how little he or she will say." *United States v. Glass*, 761 F.2d 479, 480 (8th Cir. 1985). As the Fourth Circuit said in *Moore v. South Carolina*, "[I]t was perfectly permissible for the sentencing judge, in the course of sentencing the petitioner, to comment upon all these facts, on the gravity of the petitioner's offenses, and on the serious injuries the victims of his criminal activity had suffered at the petitioner's hands." Nos. 88-6676, 90-6539 1991 U.S. App. LEXIS 2039, *18 (4th Cir. 1991) "We recognize that a sentencing court can consider the impact a defendant's crimes have had on a community and can vindicate that community's interests in justice. To a considerable extent a sentencing judge is the embodiment of public condemnation and social outrage. As the community's spokesperson, a judge can lecture a defendant as a lesson to that defendant and as a deterrent to others." *United States v. Bakker*, 925 F.2d 728, 740 (4th Cir. 1991). This is especially the case where each of the Court's statements during sentencing related to "matters the Court was required to assess and take into account in imposing an appropriate sentence." *Pills v. United States*, 1:96cr483 2006 US Dist. LEXIS 84536, *4 (E.D. Va. 2006).

In the instant case, this Court had two principal matters before it on May 23, 2008. First, the Court had to determine whether good cause had been shown to set aside the jury's verdict of death. On many occasions, our appellate courts have emphasized the broad range of considerations which a trial court must take into account in determining whether good cause has been found to set aside a jury's death sentence. *See, e.g., Bassett v. Commonwealth*, 222 Va. 844, 860, 284 S.E.2d 844, 854 (1981) ("The phrase 'upon good cause shown' merely reiterates the rule applicable in all cases, misdemeanor, felony, or capital, when the court must consider altering a jury verdict. The same criterion applies in capital as well as non-capital cases."); *Breard v. Commonwealth*, 248 Va. 68, 76, 445 S.E.2d 670 676 (1994) ("In the present case, the trial court made an independent review of Breard's death sentence and concluded that there was no 'good cause' to set it aside."); *Lovitt v. Commonwealth*, 260 Va. 497, 518, 537 S.E.2d 866, 880 (2000) (the "good cause shown" requirement "permits the capital murder defendant the same opportunity as any other criminal defendant, under a precise and unambiguous standard, to request that the trial court alter the jury's verdict.").

Second, the Court had to sentence the defendant on the non-capital offenses, including an offense which the jury had determined warranted a life sentence, the defendant's conviction for the rape of Ms. Raver. Our appellate

courts on many occasions have emphasized the Court's general obligation to carefully and conscientiously review a jury's sentencing decision. *See, e.g., Duncan v. Commonwealth*, 2 Va. App. 342, 345, 343 S.E.2d 392, 394 (1986) ("The verdict of the jury is the fixing of maximum punishment which may be served. Under such practice, the convicted criminal defendant is entitled to `two decisions' on the sentence, one by the jury and the other by the trial judge in the exercise of his statutory right to suspend; the defendant's "ultimate sentence . . . does not [therefore] rest with the jury' alone but is always subject to the control of the trial judge.") (quoting *Vines v. Muncy*, 553 F.2d 342, 349 (4th Cir. 1977)); *Bruce v. Commonwealth*, 9 Va. App. 298, 302, 387 S.E.2d 279, 281 (1994) (judge's role is as "final arbiter" in determining whether jury's recommended sentence should be imposed); *Swain v. Commonwealth*, 28 Va. App. 555, 561, 507 S.E.2d 116, 119 (1998) ("The jury's sentence is subject to the judge's review after considering at the sentencing hearing various mitigating, extenuating, or even aggravating circumstances.").

These matters could not have been more consequential. As defense counsel notes in their recusal motion, the sentencing judge is "the ultimate sentence authority in Virginia capital cases." (Def.'s Motion for Recusal 4.) It is worth noting here that, because the sentencing judge is the ultimate sentencing authority in a capital case, there is no significant difference between a jury trial and a non-jury trial when it comes to the matter of recusal. In either case, the trial judge is called upon to make critical decisions, and he must be impartial. Although there is some case law that suggests a distinction between a jury trial and a non-jury trial, *see, e.g., United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) ("Upon remand for a retrial, an additional factor bearing upon whether to reassign to another judge is whether the retrial will be before the judge as a fact-finder or sitting with a jury"), it is clear in Virginia that it makes no material difference whether the defendant will be tried by the bench or by a jury. *See Broady v. Commonwealth*, 16 Va. App. 281, 287, 429 S.E.2d 468, 472 (1993) (That a case is to be tried to a jury is "given little weight in determining whether the judge should recuse himself. Many of the legal issues in a trial involve mixed questions of law and fact and require the judge to be the fact finder on certain issues. Further, many critical rulings in a case are left to the sound discretion of the trial judge, not the least of which is whether to impose or suspend the jury's recommended sentence. Therefore, the fact that the case is to be tried by a jury should be accorded little, if any, weight in determining whether the judge should recuse himself."). These principles apply as well in a capital case where the trial court may be called upon to determine whether good cause has been shown to set aside a jury's death sentence. While the Court's discretion in such an instance may not be "unlimited," it is still very substantial and does require the Court to consider and weigh all the mitigating and aggravating evidence. *Compare*

*Bassett v. Commonwealth*, 222 Va. 844, 860, 284 S.E.2d 844 (1981), *with Chandler v. Commonwealth*, 249 Va. 270, 273, 455 S.E.2d 219, 223 (1995).

This Court deemed it entirely appropriate and well within its discretion to explain each of the decisions it was charged with making. As the Court said at the time: "Given the gravity of the decisions before me today, I believe it is incumbent on the Court not only to announce its decision but to explain it, which I will now proceed to do." In choosing to explain its determination that no good cause had been shown to set aside a death penalty jury verdict, the Court was doing nothing unusual. *See, e.g., Bassett*, 222 Va. at 860 ("Bassett argues further that the trial court improperly exercised its discretion in refusing to reduce his sentence to life imprisonment. We disagree. The trial judge had heard the evidence twice and was thoroughly familiar with the facts. *His remarks at sentencing show that he. recognized the aggravating factors and looked for mitigating factors, but found none.* We affirm his action as a proper exercise of discretion." (emphasis added)).

The defendant's argument is especially unpersuasive given the fact that the statements about which the defendant now complains all relate directly to the precise task which defense counsel, in both his sentencing memorandum and sentencing argument, asked this Court to undertake, i.e., to give careful, conscientious and serious consideration to all the mitigating and aggravating factors weighing on sentencing and the death penalty decision. For example, see these passages from the defendant's sentencing memorandum: "the legislature has determined that there will be times when, despite the dutiful work by the jury, the court is justified in substituting its judgment in favor of life" "this court can look at the facts of this case, can accept the jury's determination that the crimes were vile and that Mr. Prieto is a danger, and can still conclude that he should not be killed" "the years surrounding his birth, his upbringing, and his adolescence were horrid" "he has become active in the prison church, attending services without fail for years, and helping with the mass." "So long as this court can conclude that Mr. Prieto is receiving significant punishment, a life in prison without the possibility of parole, and so long as the court can find that, at age 43, he is a different man than he was at age 24 and that he can continue to change, there is room for the court to exercise its discretion to keep him alive. We ask the court to do so." (Def.'s Position on Sentence 1-4.) And for example, see these arguments made at the defendant's sentencing hearing: "this man had a horrid — which is my word — upbringing, raised in utter poverty, a poisonous environment, family abuse, malnutrition, abandonment by his mother, the horrors of the war years in El Salvador, loved ones slaughtered, including the grandfather right in front of his eyes, people dragged out of their homes at night." "Mr. Prieto is a changed man, Judge." "Beyond that, Judge, too, is the issue of vileness. You have got the ability to weigh that in a way that this jury does not have, and the jury found it was vile; we must accept that." "We believe it is appropriate for you to exercise your authority

that the Legislature has given you, and we ask that you do that." (Trial Tr. 17, 19, 23, May 23, 2008.) That the Court ultimately rejected the position of the defendant, or that the Court undertook to explain its reasons for its decisions, can hardly be a basis for recusal.

### 3. *The Court Was Not Persuaded by the Mitigation Evidence*

The defendant argues that the Court's partiality is further illustrated by the fact that the Court ultimately found none of the mitigating circumstances to actually mitigate "in any respect" the crimes which he committed. They argue that "[r]ecusal is required here because given the judge's heart-felt and highly emotional declaration that Prieto's mitigation evidence was of no value and that the crimes deserved death, the public can have no confidence that, when faced with these issues again, the decision will be made on a clean slate, unaffected by what went before." (Def.'s Motion to Recuse 3.)

This Court, however, never stated that the mitigation evidence was "of no value." Indeed, the Court stated that "I have carefully considered, Mr. Prieto, all the evidence which has been offered in mitigation of the crimes that you have committed. I have no doubt that your upbringing was difficult and that you were exposed to an unusual degree of violence." What the Court did find is that these circumstances did not, however, ultimately serve to mitigate the crimes he committed.

In every case in which the trial court is called upon to decide whether good cause has been shown to set aside a sentence of death, the Court must make a judgment about the significance to attach to the mitigation evidence. That is precisely what the Court did. Moreover, the Court stated explicitly that it had considered all pertinent factors placed before it. "After weighing all the aggravating and mitigating circumstances, after full consideration of the presentence report, the Defendant's sentencing memorandum, all the evidence presented at trial, the arguments presented today, and the applicable law, I find that good cause has not been shown to set aside the jury's verdict of death." (Trial Tr. 37-38, May 23, 2008.) As to the fact that the Court ultimately determined that "the crimes deserved death," as defense counsel put it in their motion, that is no basis for recusal. As the Court of Appeals stated in *Wilson v. Commonwealth*, "[T]he imposition by the trial judge of the maximum sentence permitted by law is not, by itself, sufficient to show that the trial judge harbored actual or apparent bias or prejudice against the defendant." 46 Va. App. 408, 430, 617 S.E.2d 431, 445 (2005). *See also United States v. Taggart*, 92-6469 1993 U.S. App. LEXIS 1067 (4th Cir. 1993); *State v. Ortiz*, 91 Haw. 181, 196, 981 P.2d 1127 (1999) ("Finally, it is absurd to suggests that the circuit court's imposition of an extended term sentence amounted to a demonstration of personal bias or prejudice."); *Cook v. State*, 612 N.E.2d 1085, 1088 (Ind. App. 1993)

(Adverse rulings or the imposition of the maximum possible sentence do not support a claim of bias.).

4. *The Court Spoke with Emotion*

The defendant argues that the Court exhibited great emotion during the sentencing proceeding and that this means that the Court would be unable to fairly and impartially serve as a judge at a resentencing proceeding. The Court finds this argument to be without merit. Put simply, a judge may speak with emotion without providing any basis for recusal. Many courts have noted that "[e]motions can run high in a courtroom." *See, e.g., United States v. Snyder*, 235 F.3d 42, 48 (1st Cir. 2000); *see also United States v. Valenti*, 120 F. Supp. 80, 90 (D. N.J. 1954) (noting that a trial judge cannot always display "stoic passivity" because "[a] judge of a court is human. . . .") (citation and internal quotation omitted). Judges are not required to shed their humanity when they don their robes. What a judge may *not* do is to be swayed or driven by emotion in his decisions. *See United States v. Valenti*, 120 F. Supp. at 90 ("Insofar as he is not swayed by these natural emotions to do any man an injustice, the fact that he has them in common with his brother man does not disqualify him from trying a case.") (citation and internal quotation omitted); *Cook v. State*, 612 N.E.2d 1085, 1088-89 (Ind. App. 1993) ("We first conclude that the mere fact that a judge has an emotional reaction does not demonstrate that the judge is biased or prejudiced. . . . [t]he fact that the trial judge was emotional does not require her recusal unless she was swayed by that emotion."); *Creager v. State*, 737 N.E. 2d 771, 783-84 (Ind. App. 2000) (fact that trial judge was emotional during sentencing is not grounds for recusal. "Given the nature of the crimes and the fact that we have already determined that the enhancement of the sentences were proper, we find no basis to conclude that the judge was biased toward [the defendant] or that his recusal was warranted."). Here, there is no support for the assertion that this Court was "swayed" by emotion. Rather, a review of the "whole record," including the statements made by the Court during sentencing, indicate that each of its decisions were based on reason, logic, and the evidentiary record before it.

5. *The Court Read from a Prepared Statement*

The defendant argues that the Court read from a prepared statement during the sentencing proceeding, which is cited as further support for a finding of partiality. The Court finds this argument to be without merit, for multiple reasons. First, the Court is aware of no case law that suggests that a judge acts improperly when it makes preparations for a hearing, including the preparation of tentative remarks or observations. Second, the implication of the defendant's argument is that the trial court made up its mind before it even knew of the defendant's sentencing argument.

This, however, ignores the fact that defense counsel filed a comprehensive sentencing memorandum well prior to sentencing, which in its forty-four pages of text and attachments laid out the defendant's mitigation arguments in meticulous detail. (Def.'s Position on Sentence.) Third, throughout the sentencing proceeding, the trial court repeatedly invited defense counsel to address the Court on various issues (and based on those arguments, made alterations in the presentence report), as well as provided Mr. Prieto an opportunity to make any statement he wished to the Court. Finally, the Court listened carefully to each argument made by defense counsel and only spoke *after* their arguments were complete.

### 6. The Defendant has "Concerns"

The defendant argues that "beyond the public perception, are Mr. Prieto's concerns" and that the defendant "has more than a reasonable basis for concern about which judge will make decisions about his life." The case law of Virginia is clear, however, that "[i]t is the public's perception of bias, not a litigant's personal perception, that a judge must consider when determining whether recusal is necessary to preserve the integrity of the judicial system." *Scott v. Rutherfoord*, 30 Va. App. 176, 190, 516 S.E.2d 225, 232 (1999).

### 7. The Case Law Cited to by the Defense

Finally, the defendant cites a number of cases in support of his motion. As the following discussion demonstrates, however, none of the principal cases upon which the defendant principally relies actually support the recusal relief he now seeks. Indeed, not only do these cases not support the defendant's position, but they illustrate the type of circumstances that might warrant recusal and how distinguishable they are from the instant case.

### a. *Liteky v. United States, 510 U.S. 540 (1990)*

*Liteky* is cited by the defense for the proposition that "[a] favorable or unfavorable disposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Liteky*, 510 U.S. at 551. One reading this passage might reasonably conclude that *Liteky* abandoned the principle that the alleged bias and prejudice to be disqualifying must stem from an extrajudicial source. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966). "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the

case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) (citing *Berger v. United States*, 255 U.S. 22, 31, 41 S. Ct. 230, 65 L. Ed. 481 (1920)). *Liteky*, however, did nothing of the sort. Indeed, *Liteky* undermines the defendant's position in multiple respects.

First, *Liteky*, which involved the interpretation and application of the federal recusal statute, 28 U.S.C. § 455, largely retains the "classic formulation." *Liteky*, 510 U.S. at 544. The "classic formulation" states that, in order to be disqualifying, the alleged bias and prejudice must stem from an extrajudicial source. Thus, *post-Liteky* federal cases still rely upon *Grinnell's* extrajudicial source doctrine. *See, e.g., Pills v. United States*, 1:96cr483 2006 U.S. Dist. LEXIS 84536, *4 (E.D. Va. 2006) ("Importantly, to be disqualifying, the bias or prejudice generally must stem from a source outside the judicial proceedings at hand."). Only in the "rarest" of circumstances, notes Justice Scalia for the majority, would it be possible to require recusal where no extrajudicial source was involved. *Id.* at 491.

The example cited in *Liteky* is to the "pervasive bias" exception to the extrajudicial source doctrine. The term "pervasive bias" would apply to a situation where the judge's conduct during judicial proceedings "demonstrates such pervasive bias and prejudice that it constitutes bias against a party." *Wiley v. Wainwright*, 793 F.2d 1190, 1193 (11th Cir. 1986). This exception to the extrajudicial source rule has been "rarely invoked." *United States v. Rosenberg*, 806 F.2d 1169, 1174 (3d Cir. 1986). No allegation of "pervasive bias" has been made here.

Second, *Liteky* makes clear that "Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555.

Third, *Liteky* also makes clear that judicial remarks "during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* Justice Scalia then cites the example of the statements alleged to have been made by the District Judge in *Berger v. United States*, " 'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty'." *Id.* (citing *Berger v. United States*, 255 U.S. 22, 28, 41 S. Ct. 230, 65 L. Ed. 481 (1921)).

Fourth, *Liteky* states that "*[n]ot* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.*

Fifth, *Liteky* states that, even where a judge does form a negative opinion as to a defendant based upon the evidence adduced at trial, it is no grounds for recusal. "The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who

has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings and are indeed sometimes, as in a bench trial, necessary to completion of the judge's task." *Id.* at 550.

Sixth, *Liteky* makes clear that, even where opinions are formed based on what a judge learned in an *earlier* proceedings, such opinions are "not subject to deprecatory characterization as `bias' or `prejudice.' It has long been regarded as normal and proper for a judge to sit in the same case upon its remand and to sit in successive trials involving the same defendant." *Id.* at 551.

Seventh, and specifically on the definition of the term "personal bias or prejudice" as that term is used in the federal disqualification statute, *Liteky* makes it clear that, where a trial judge's views are based on information acquired by a trial judge in a prior proceeding, it does not constitute personal bias or prejudice. *Id.* at 553 ("The objective appearance of an adverse disposition attributable to information acquired in a prior trial is not an objective appearance of personal bias or prejudice, and hence not an objective appearance of improper partiality.").

Nevertheless, as Justice Kennedy notes in his concurrence in *Liteky*, a judge retrying a case must approach that retrial with complete impartiality. "If, for instance, a judge presiding over a retrial should state, based upon facts adduced and opinions formed during the original cause, an intent to ensure that one side or the other shall prevail, there can be little doubt that he or she must recuse." *Liteky*, 510 U.S. at 558; *see also United States v. Snyder*, 235 F.3d 42 (1st Cir. 2000) (remanding to another judge for resentencing where original sentencing judge, after being reversed, declared that he would impose the same sentence as before, even if he were reversed again "ten times." (*citing City of Columbus v. Hayes*, 68 Ohio App. 3d 184, 587 N.E.2d 939, 942 (1990))); *Rugenstein v. Ottenheimer*, 78 Ore. 371, 372, 152 P. 215 (1915) (reversing for judge's failure to disqualify himself on retrial, where judge had stated: "This case may be tried again, and it will be tried before me. I will see to that. And I will see that the woman gets another verdict and judgment that will stand."); *Doering v. Fader*, 316 Md. 351, 359, 558 A.2d 733 (1989) (in which the trial judge indicated that, if this death penalty case was assigned to him on remand, there was a "very, very, very great probability" as to the result he would reach.). There is, of course, no allegation here that this Court has expressed any such sentiment.

The defendant also relies upon *Liteky* for this statement from Justice Kennedy's concurrence, "In matters of ethics, appearance and reality often converge as one." *Liteky*, 510 U.S. 540, 565, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1990) (Kennedy, J., concurring) (citations omitted). True as that is, however, the cases upon which Justice Kennedy relies in making this statement bear no resemblance to the instant case. *See, e.g., Offutt v. United*

*States*, in which the trial court's animosity toward defense counsel was so pronounced as to lead him to state *to the jury*: "I also realize that you had a difficult and a disagreeable task in this case. You have been compelled to sit through a disgraceful and disreputable performance on the part of a lawyer who is unworthy of being a member of the profession, and I, as a member of the legal profession, blush that we should have such a specimen in our midst." 348 U.S. 11, 17, n. 3, 75 S. Ct. 11, 99 L. Ed. 11 (1954). In *Offutt*, the Supreme Court reversed an order of summary criminal contempt and ordered on remand that the case be heard before another judge. *Id.* at 18. In doing so, the Court held: "The record discloses not a rare flare-up, not a show of evanescent irritation, a modicum of quick temper that must be allowed even judges. The record is persuasive that instead of representing the impersonal authority of law, the trial judge permitted himself to become personally embroiled with the petitioner." *Id.* at 17.

Finally, the result in *Liteky* is directly contrary to the position asserted by the defendant here, i.e., that, based on a judicial ruling and the Court's articulation of the rationale for that ruling, it ought to be recused. As the Supreme Court said in *Liteky*:

> None of the grounds petitioners assert require[] disqualification. As we have described, petitioners' first recusal motion was based on rulings made, and statements uttered, by the District Judge during and after the 1983 trial, and petitioner Bourgeois' second recusal motion was founded on the judge's admonishment of Bourgeois' counsel and codefendants. In their briefs here, petitioners have referred to additional manifestations of alleged bias in the District Judge's conduct of the trial below, including the questions he put to certain witnesses, his alleged 'anti-defendant tone,' his cutting off of testimony said to be relevant to defendants' state of mind, and his post-trial refusal to allow petitioners to appeal *in forma pauperis*. All of these grounds are inadequate under the principles we have described above. They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

*Id.* at 556.

### b. *United States v. Robin, 553 F.2d 8 (2d Cir. 1977)*

The defendant cites *Robin* for the principle that, in deciding a recusal matter, a reviewing court should consider three factors: "(1) whether

the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Robin*, 553 F.2d at 10.

The defendant acknowledges that *Robin* is not controlling in this jurisdiction but nevertheless requests the Court use *Robin* as a framework for analyzing the instant recusal motion. Further, the defendant acknowledges that the first factor is inapplicable in the instant case. The defendant argues, however, that the second factor "clearly weighs in favor of recusal." (Def.'s Motion to Recuse at 5.) This Court disagrees. Indeed, the *Robin* case illustrates just how far removed the instant situation is from a case warranting recusal.

To understand this point, it is necessary to turn to the case that preceded *Robin*, i.e., *United States v. Robin*. 545 F.2d 775 (2d Cir. 1976) (hereinafter "*Robin I*"). In *Robin I*, the Second Circuit cited nine points, not one of which is present in the instant case: (1) the defendant's sentencing occurred after a plea, not a trial, a significant point given the appellate court's judgment that there were multiple sentencing procedure errors that could have been cured if the Court had heard detailed evidence regarding the defendant's alleged misconduct; *id.* at 776-78; (2) the defendant's sentence led the appellate court to state: "[W]e are especially concerned when a harsh sentence is imposed upon so questionable a foundation as existed in this case;" *id.* at 782; (3) the defendant's counsel was only allowed to see the presentence report on the morning of sentencing and could not remove it from chambers or show it to his client; *id.* at 777; (4) the defendant offered exhibits to rebut the government's version of the facts but the court refused to consider them; *id*; (5) the court received the Government's version of the facts, which went substantially beyond the offense of conviction, even though there was a major dispute regarding accuracy; *id*; (6) the Court of Appeals found that "serious error was committed in the course of the sentencing procedures"; *id.* at 778; (7) the District Court made it "virtually impossible for counsel to have read the [presentence] report carefully within a very short space of time, let alone to have digested it or prepared a satisfactory rebuttal;" *id.* at 780; (8) the Court of Appeals found that "[t]he conclusion is inescapable that the appellant was severely impaired at sentencing by inadequate preparation that was wholly beyond his control" and a "serious question respecting accuracy was raised;" *id.* at 782; (9) it was the "preferred practice in such cases" to assign the resentencing to a different judge. *Id.*

In short, *Robin I* required recusal because the defendant's sentencing proceeding was permeated with error. Contrast that with the instant case. First, this defendant did not at the time of sentencing object to the Court's

comments, nor did he raise such an objection with this Court subsequently. Second, the Supreme Court of Virginia certainly has made no finding that the defendant's sentencing proceeding involved error.

The defendant also argues that the third *Robin* factor supports recusal, asserting that there would be little administrative inconvenience associated with a recusal. In support of his position, he notes that prior to this Court's service on the case, the matter was assigned and initially tried by Chief Judge Smith, who reassigned the case to this Court when he became Chief Judge.

A trial judge should not recuse himself "lightly," *United States v. Snyder*, 235 F.3d 42, 45 (1st Cir. 2000), or upon the "unsupported suggestion of a party." *Davis v. Commonwealth*, 21 Va. App. 587, 591, 466 S.E.2d 741 (1996). While the defendant argues that there is little cost for recusal in the instant case, "because whichever judge presides over Prieto's resentencing will hear in full the evidence presented in aggravation and in mitigation" (Def.'s Motion for Recusal 6), this argument fails to note two important points.

First, the Supreme Court of Virginia affirmed each of the defendant's convictions, and those matters will not be retried. In this respect, it is worth noting this language from *United States v. Robin*: "A judge who has presided over a lengthy trial often gains an intimate insight into the circumstances of the defendant's crime, which may prove uniquely useful in determining the sentence to be imposed. . . . Where the original judge has gained familiarity with a detailed factual record, which is vital to the determination to be made on remand and the reversal is not based on erroneous findings or the admission of prejudicial evidence that would be difficult to erase from the mind, the case may properly be remanded to the original trial judge, since assignment to a different judge would only entail wasteful delay or duplicated effort." 553 F.2d 8, 11 (2d Cir. 1977); *see also Doering v. Fader*, 316 Md. 351, 358, 558 A.2d 733 (1989) ("The appropriate question is whether the trial judge is confident that he could, if persuaded by additional evidence or argument, come to a conclusion different from that which he has reached upon consideration of the proceedings to date. If he can and if there are not other disqualifying facts which do not appear in this record, he is competent to sit and should not recuse himself. This trial judge has the benefit of having heard the entire trial and the previous sentencing proceeding. That places him in an excellent position either to preside over a second jury sentencing proceeding or, if the defendant waives his right to a jury, to hear the evidence and arguments and pass judgment.").

Second, in the sentencing phase of this trial, the Court addressed numerous complex matters regarding the mental retardation issues and associated testing issues, expert testimony, forensic evidence, and the admissibility of particular aggravating and mitigating evidence. None of the Court's decisions in these areas were reversed on appeal, and there is

a clear benefit in having the same judge address these issues to the extent they arise again.

This Court, however, need not dwell on this argument for there is no exception in Canon 3(E)(1) for administrative inconvenience, nor is this Court aware of any case law in the Commonwealth that suggests that a Court considering recusal ought to weigh the administrative inconvenience associated with a disqualification against considerations of fairness and partiality. Simply put, if this Court ought to recuse, it ought to recuse, and it would not be dissuaded from that course of action because it would result in some waste, duplication, or administrative inconvenience. Thus, to the extent that *Robin* suggests a weighing of "waste and duplication" versus "preserving the appearance of fairness," the Court rejects that such a weighing is permissible under Virginia law.

### c. *United States v. Guglielmi, 929 F.2d 1001 (4th Cir. 1991)*

The defendant cites *Guglielmi* in support of the assertion that this Court ought to recuse itself "to preserve the appearance of justice." The defendant states, "In *Guglielmi*, the Fourth Circuit considered whether a case should be reassigned to a new district judge to determine if the appellant's sentence was unduly harsh as alleged in his motion under Rule 35 of the Federal Rules of Criminal Procedure." (Def.'s Motion to Recuse 5-6.) The facts of *Guglielmi* demonstrate, however, that, like *Robin*, they have nothing in common with the instant case. *Guglielmi* involved repeated remands to the District Court for the District Court to consider a Rule 35 reduction of sentence and to properly exercise its discretion. *United States v. Guglielmi*, 929 F.2d 1001 (4th Cir. 1991). After having been frustrated twice in this effort, the Court of Appeals held that it would be "unfair" and "unreasonable" to expect the District Court in the context of the case at hand to exercise discretion after having failed in that effort twice. *Id.* at 1007. To remand to the same judge would only result in the courts' being "locked in an endless cycle of remands and renewed appeals that will move us no closer to discerning a meaningful exercise of the sentencing judge's discretion. . . ." *Id.* Moreover, the Fourth Circuit emphasized that requiring remand to a different judge was not based on a finding of bias, precisely the grounds asserted in the instant case. *Id.* Finally, the Fourth Circuit relied upon the first prong of *Robin*, indeed quoting *Robin* to the effect that reassignment to another judge may be advisable to avoid an exercise in futility "where a judge has repeatedly adhered to an erroneous view after the error is called to his attention. . . ." *Id.* As stated above, the defendant here is not relying upon *Robin*'s first prong.

*d. In re State v. Moore, 988 So. 2d 597 (Ala. Crim. App. 2007)*

The defendant cites *Moore* in support of the proposition that the principles of *Robin* apply with equal force both to issues of reassignment upon remand and to issues of recusal motions. (Def.'s Motion to Recuse 6, n. 2.) The defendant argues that, in *Moore*, the appellate court concluded that "[t]he *Robin* factors weigh heavily in favor of recusal." *In re State v. Moore*, 988 So. 2d 597, 603 (Ala. Crim. App. 2007). *Moore*, however, has no bearing on the instant case. In *Moore*, the appellate court confronted a situation of a "great deal of animosity" between the prosecutor and the judge, culminating in the trial judge's repeatedly accusing the prosecutor of lying and this statement from the trial court: "If I displayed contempt or disrespect at times, I was simply responding in kind to the prosecutor's disrespect, contemptuousness, and frequent violation of my orders." *Id.* Indeed, the "public perception" of the case had become that "it is not the State against the defendant, as it should be, but the prosecutor against the judge." *Id.* These circumstances bear no resemblance to the instant case.

There is, however, another Alabama case which raises issues similar to those alleged in the instant case. *See Ex parte Duncan*, 638 So. 2d 1332 (Ala. 1994). Duncan was a capital murder case in which the jury returned a verdict of life without parole, and the trial court overrode the jury's verdict and sentenced Duncan to death. *Id.* at 1333. The Court of Criminal Appeals reversed and remanded for a *Batson* hearing. *Id.* The trial court held that there had been no *Batson* violation. *Id.* The Court of Criminal Appeals then reversed and remanded for a new trial, at which point Duncan moved the trial judge to recuse. *Id.* The judge refused to do so. *Id.* Duncan then sought a writ of mandamus from the Supreme Court of Alabama, alleging that the trial judge evidenced personal bias and prejudice against the defendant and cited the following statement by the trial court at sentencing:

> Now the murder in this case was premeditated, it was diabolical, methodical, heartless, cruel, cold, deliberate, it was planned. It was a planned execution and slaughter of an innocent young lady while she quietly and peacefully waited unsuspectingly on the sacred grounds of a little country church on the Sabbath evening. . . . There was no excuse, there was no justification, for a vile, conscienceless, pitiless murder.

*Id.*

The Supreme Court of Alabama rejected recusal: "In this case, we cannot say, as a matter of law, that the trial judge's statements in and of themselves show bias, hostility, or prejudice toward Duncan; therefore, we cannot say that Duncan has demonstrated a clear legal right to have the trial judge remove himself. The trial judge's statements arose out of a judicial

proceeding, not from an extrajudicial source, and, although the trial judge's expressed opinions may have been better left unsaid, in our opinion, the remarks he made do not show bias, hostility, or prejudice against Duncan arising from a `personal,' i.e., extrajudicial source." *Id.* at 1334.

> e. *Commonwealth v. Jackson, 267 Va. 226, 590 S.E.2d 518 (2004); Stamper v. Commonwealth, 228 Va. 707, 324 S.E.2d 682 (1985); Wilson v. Commonwealth, 272 Va. 19, 630 S.E.2d 326 (2006)*

Finally, the defendant relies upon these three Virginia cases to make certain general points about recusal case law. However, none of these cases raise issues similar to those alleged in the instant case or support the relief requested by the defendant.

In *Jackson*, the Supreme Court addressed whether a trial judge must recuse himself from presiding over a probation revocation hearing if he was the Commonwealth's Attorney for the jurisdiction at the time and place of the defendant's original criminal conviction. *Commonwealth v. Jackson*, 267 Va. 226, 590 S.E.2d 518 (2004). The Court held that no recusal was required. *Id.* at 230.

In *Stamper*, the Supreme Court addressed whether a trial judge should have recused himself *sua sponte* where the defendant regularly practiced before him, where the judge had personal knowledge of the defendant's mental state on the date of the offense (to which the judge made reference at the time of sentencing), and where the judge made "several adverse rulings." *Stamper v. Commonwealth*, 228 Va. 707, 324 S.E.2d 682 (1985). The Court held that the "record contained no indication that the court's impartiality was reasonably subject to question" and there were "no facts" requiring the judge's *sua sponte* recusal. *Id.* at 687.

In *Wilson*, the Supreme Court ordered recusal where the trial judge "exhibited a personal bias or prejudice" against defense counsel, as illustrated by describing the attorney's actions as "shenanigans," peremptorily removing defense counsel from the court-appointed list, attempting to remove him as attorney for the defendant, and stating that he did not want the attorney appearing in the court building as a court-appointed attorney. *Wilson v. Commonwealth*, 272 Va. 19, 630 S.E.2d 326 (2006).

## C. *The Court's Decision*

The Court finds no basis for recusal in the instant case. None of the cases cited by the defendant and none of the cases which this Court has reviewed in preparing this opinion support the relief which the defendant now requests. Indeed, they support the opposite conclusion. Moreover, the record of these proceedings demonstrates that, throughout this Court's service as presiding judge of this matter, this Court has strived to be fair and

impartial to all sides. In particular, the sentencing statements made by the Court were made in the performance of this Court's official duties, involved matters that lay at the core of the Court's sentencing responsibilities, and were based solely and exclusively on evidence and other material properly before the Court.

*Justus* states that a trial judge asked to recuse himself "must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny the defendant a fair trial." *Justus*, 222 Va. at 673. *Stamper* states that "[i]n exercising his [or her] discretion in this regard, the judge must be guided not only by the true state of his [or her] impartiality, but also by the public perception of his [or her] fairness, in order that public confidence in the integrity of the judiciary may be maintained." *Stamper*, 324 S.E.2d at 686. This Court finds that it is neither biased nor prejudiced against the defendant. In the words of *Stamper*, that is "the true state" of the Court's impartiality. *Id.* Further, this Court finds that there is nothing in the record from which a "public perception" could form that the Court has been or will be unfair to the defendant. To the contrary, a member of the public fully aware of all the steps this Court has taken to protect Mr. Prieto's rights throughout these proceedings would judge that this Court has been scrupulously fair. Recusal in the instant case, far from enhancing public confidence in the "integrity of the judiciary," would diminish it, for it would suggest that a judge who clearly, explicitly, and strongly expresses his reasons for imposing a death sentence thereby taints himself from further participation in the case.

## III. *Conclusion*

At oral argument, defense counsel invited the Court to recuse itself as a way of insuring that this issue would not ultimately result in a reversal and the need for a further resentencing hearing. But that has never been the standard for a trial judge in making any decision, let alone a decision to recuse. If there is no basis for recusal, this Court has a duty to hear the cases to which he has been assigned. *See, e.g., Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir. 1979) ("trial judge must hear cases unless some reasonable factual basis to doubt the impartiality or fairness of the tribunal is shown by some kind of probative evidence."); *United States v. Snyder*, 235 F.3d 42, 46 (1st Cir. 2000) ("[T]he unnecessary transfer of a case from one judge to another is inherently inefficient and delays the administration of justice."); *Anderson v. United States*, 754 A.2d 920, 925 (D.C. App. 2000) ("Although a judge has a duty to recuse when required, `a judge has as strong an obligation not to recuse when the situation does not require'." (citations omitted)).

In this case, after considering the merits of the defendant's motion and the applicable case law, this Court concludes that there is no basis for

recusal. The Court will, however, add the following statement, in light of the fact that, in essence, the defendant's motion asserts that the Court's mind has become "irrevocably closed". This Court intends to conduct this resentencing proceeding in a fair and impartial manner. *See United States v. Snyder*, 235 F.3d 42, 48 (1st Cir. 2000). In particular, in the event that this Court is again called upon to determine whether good cause has been shown to set aside a jury's verdict of death, the Court will approach that decision with an open mind. In other words, if called upon to consider this question anew, the Court will consider the question anew, and it will make its decision based upon the evidence and arguments properly before it.